**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **JONATHAN LOPEZ,** | ) |
| | ) |
| **Plaintiff,** | ) **CIVIL ACTION NO. 3:14-CV-257** |
| | ) |
| **v.** | ) **JUDGE KIM R. GIBSON** |
| | ) |
| **CSX TRANSPORTATION, INC.,** | ) |
| | ) |
| | ) |
| **Defendant.** | ) |

## MEMORANDUM OPINION

### I.  Introduction

Before the Court is Defendant's motion for summary judgment. (ECF No. 44.)

The issues have been fully briefed (*see* ECF Nos. 45, 46, 52, 53, 58) and the motion is ripe

for disposition. For the reasons that follow, Defendant's motion will be **GRANTED in**

**part and DENIED in part**.

Also before the Court is Defendant's motion to strike Plaintiff's request for

summary judgment. (ECF No. 55.) Defendant's motion will be **DENIED** as moot.

### II.  Jurisdiction

The Court has subject matter jurisdiction over the instant action pursuant to 28

U.S.C. §1332 and 28 U.S.C. § 1441. Venue is proper pursuant to 28 U.S.C. § 1391.

### III.  Background

Plaintiff initiated this action by filing a complaint in the Court of Common Pleas

of Cambria County, Pennsylvania, on November 3, 2014. (ECF No. 1.) Defendant

removed the case to this Court on November 26, 2014. (*Id.*) This Court heard oral

argument on Defendant's motion for summary judgment on February 9, 2017. (*See* ECF No. 48.)

Before analyzing the complex legal issues involved in this case, the Court will briefly summarize the facts.

### a. The Accident

At around 1:00 p.m. on January 18, 2013, Plaintiff approached the Ferndale Crossing in Cambria County, Pennsylvania ("the Crossing") on foot, walking north to south. (ECF No. 46 at 5.) It was a "clear and cold" day, and at 1:00 p.m. it was "daylight." (ECF No. 53 at 7.) Plaintiff lived near the Ferndale Crossing and was generally familiar with the area. (*Id.*) In fact, he had traversed the Ferndale Crossing on several prior occasions, on foot and by car. (*Id.*) However, Plaintiff had not previously encountered a train at the Crossing, and assumed that the crossing was essentially unused. (*Id.*) Unfortunately for Plaintiff, the Crossing was not unused.

As Plaintiff walked towards the Crossing that cold, clear January afternoon, a train was also approaching the intersection, traveling eastbound on the Crossing's only track. (*Id.* at 8.) As Plaintiff stepped onto the Crossing, he was struck by the train. Plaintiff suffered serious injuries, and his lower left leg was amputated. (*Id.* at 23.)

The Crossing itself had neither a bell (*Id.* at 13) nor a gate. (ECF No. 52 at 38.) However, the parties agree that several warnings existed to warn people that the train was about to enter the Crossing. First, approximately twenty-five seconds before the train entered the Crossing, automated warning lights at the Crossing activated, and flashed continuously until the collision. (ECF No. 46 at 31.) Second, as the train

approached the Crossing, three lights on the lead engine unit were illuminated: the headlight was on and two lights below the headlight were flashing. (*Id.* at 11.) Third, the train sounded its horn approximately sixteen (16) seconds before it entered the Crossing, and issued several horn blasts.[1] (*See Id.* at 10; ECF No. 53 at 12.) Fourth, the train's bell was ringing. (ECF No. 53 at 13.)

Vehicular traffic stopped to allow the train to pass. (*Id.* at 10.) However, while these warnings successfully alerted nearby motorists, Plaintiff was completely unaware of the approaching train.

Plaintiff was "walking at a steady pace… with his head down, hood up, [and] cell phone in hand." (*Id.*) Plaintiff was listening to music on his cell phone (ECF No. 46-5 at 97) without earbuds (*Id.* at 98) by holding his phone up to his ear on the outside of his hood. (*Id.* at 101.) Plaintiff never heard the train's horn or bell. (*Id.* at 126.) Plaintiff never looked up at all as he approached the Crossing (*Id.* at 101), and did not notice that vehicular traffic had stopped. (*Id.*) Plaintiff never looked to see if a train was approaching (*Id.*), and never looked up at the warning lights. (*Id.*)

Three crew members were aboard the train at the time of the accident: Engineer Richard Spicola, Conductor Jared Rhodes, and Jack Churby.[2] The parties do not dispute that Conductor Rhodes activated the emergency brake sometime before the collision with Plaintiff. (*See* ECF No. 53 at 20.) Defendant claims, and Plaintiff does not present

[1] The Court notes that the parties dispute the precise number of distinct horn blasts that were sounded as the train approached the Crossing. Defendant claims that five blasts were sounded (ECF No. 46 at 10), while Plaintiff contends that the horn was only sounded three times. (ECF No. 46-16, at 37.)

[2] The parties dispute whether Mr. Churby was a full conductor (as alleged by Plaintiff, *see* ECF No. 53 at 9) or merely a conductor in training (as alleged by Defendant, *see* ECF No. 46 at 24.).

any evidence to dispute, that the emergency brake had already been applied before Plaintiff stepped onto the track. (*See* ECF No. 46 at 15.) However, the parties dispute how long before impact the brake was applied.

### b. Train Speed

The parties do not dispute that the train was equipped with an event recorder which measured train speed, and that the event recorder data indicates that the train was travelling between 11.3 and 11.6 miles per hour in the seconds before the collision. (*See* Event Recorder Data, ECF No. 46-2 at 58.) Additionally, the parties do not dispute that an automatic signaling system, which measures speed based on voltage and is independent of the event recorder, measured the train's speed as 11 miles per hour when the train was approximately 79 feet from the center of the Crossing. (*See* ECF No. 53 at 21.) The parties do not dispute that the federally-mandated speed limit for the track was 10 miles per hour. (*See* ECF No. 44 at 15.)

### c. The 2007 Crossing Update

It is undisputed that federal funds were used to update the Crossing in 2007. (*See* ECF No. 46 at 4-5; ECF No. 53 at 4-5.) While the parties disagree about the nature and extent of the update, Plaintiff admits that the upgrade entailed "installation of the tract circuitry for the automatic warning activation." (ECF No. 53 at 5.) Moreover, Defendant has presented evidence through deposition testimony, which Plaintiff does not dispute, detailing the specific improvements made to the Crossing. (*See* Deposition of Brent Lewis, ECF No. 46-7.) Specifically, Defendant has presented undisputed evidence that the improvements consisted of: (1) installation of a "new crossing enclosure," i.e. "the

4

silver shed looking structure... that houses all of the control mechanisms for the crossing" (*Id.* at 91); (2) renewal of "all of... the electrical cables" and the entire "electrical service at the crossing" (*Id.*); (3) replacement of the "subgrade device that holds the illuminating structures, the pole, the lights and the crossbuck" (*Id.*); (4) and installation of a new "predictor," which "[is] used to activate the lights and actually provides the voltage to illuminate the bulb." (*Id.* at 95-96.)

## IV.    Legal Standard

"Summary judgment is appropriate only where ... there is no genuine issue as to any material fact ... and the moving party is entitled to judgment as a matter of law." *Melrose, Inc. v. Pittsburgh*, 613 F.3d 380, 387 (3d Cir.2010) (*quoting Ruehl v. Viacom, Inc.*, 500 F.3d 375, 380 n. 6 (3d Cir.2007)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed.R.Civ.P. 56(a). Issues of fact are genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also McGreevy v. Stroup*, 413 F.3d 359, 363 (3d Cir. 2005). Material facts are those that will affect the outcome of the trial under governing law. *Anderson*, 477 U.S. at 248. The Court's role is "not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party." *Am. Eagle Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 575, 581 (3d Cir. 2009). "In making this determination, 'a court must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor.'" *Farrell v. Planters Lifesavers Co.*, 206

F.3d 271, 278 (3d Cir.2000) (*quoting Armbruster v. Unisys Corp.*, 32 F.3d 768, 777 (3d Cir. 1994).

The moving party bears the initial responsibility of stating the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. If the moving party meets this burden, the party opposing summary judgment "may not rest upon the mere allegations or denials" of the pleading, but "must set forth specific facts showing that there is a genuine issue for trial." *Saldana v. Kmart Corp.*, 260 F.3d 228, 232 (3d Cir. 2001) (*quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 n. 11 (1986)). "For an issue to be genuine, the nonmovant needs to supply more than a scintilla of evidence in support of its position—there must be sufficient evidence (not mere allegations) for a reasonable jury to find for the nonmovant." *Coolspring Stone Supply v. Am. States Life Ins. Co.*, 10 F.3d 144, 148 (3d Cir.1993); *see also Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (noting that a party opposing summary judgment "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue") (internal quotation marks omitted).

## V.    Discussion

"To state a claim for negligence under Pennsylvania law, the plaintiff must allege the following elements: (1) a legal duty; (2) a breach of that duty; (3) a causal relationship between the defendant's negligence and plaintiff's injuries; and (4) damages." *Andrews v. Fullington Trail Ways, LLC*, No. CV 3:15-228, 2016 WL 3748579, at

*4 (W.D. Pa. 2016), *citing City of Philadelphia v. Beretta U.S.A. Corp.*, 277 F.3d 415, 422 n. 9 (3d Cir. 2002).

"To establish the causation element in a negligence claim, a plaintiff must allege that the defendant's breach of his legal duty was both the proximate and actual cause of injury." *McCullough v. Peeples*, No. CIV.A. 3:14-123, 2015 WL 1000223, at *3 (W.D. Pa. 2015), *citing Reilly v. Tiergarten Inc.*, 430 Pa.Super. 10, 633 A.2d 208, 210 (Pa.Super.1993). "Actual causation is present when the alleged injury would not have occurred but for a certain act or presence of a condition... while proximate causation requires that the defendant's wrongful act be a substantial factor in bringing about the plaintiff's harm." *Andrews*, 2016 WL 3748579 at *5, citing *Dudley v. USX Corp.*, 414 Pa. Super. 160, 606 A.2d 916, 923 (Pa. Super. 1992) (internal quotations omitted). Plaintiff must prove both elements of causation "by a preponderance of the evidence." *Hamil v. Bashline,* 481 Pa. 256, 265, 392 A.2d 1280, 1284 (1978).

"[Q]uestions of proximate cause are typically reserved for the jury." *Vanesko v. Marina Dist. Dev. Co., LLC,* 38 F. Supp. 3d 535, 543 (E.D. Pa. 2014) (internal citations omitted.). However, "[n]othing precludes a court from determining proximate cause as a matter of law if a jury could not reasonably differ on the issue." *Garlick v. Anadarko Petroleum Corp.*, No. 4:12-CV-01166, 2017 WL 3485738, at *16 (M.D. Pa. 2017), *citing Chetty Holdings Inc. v. NorthMarq Capital, LLC,* 556 Fed.Appx. 118, 121 (3d Cir. 2014).

Plaintiff's negligence claims fit into the following five categories: (a) negligent handling and operation of the train for failure to slow or stop before it struck Plaintiff; (b) negligent operation of the train for exceeding the authorized speed limit; (c)

negligent lack of pedestrian warning devices at the Crossing; (d) negligent maintenance of the Crossing; and (e) negligent failure to issue proper audible warnings to announce the approach of the train. Plaintiff also seeks punitive damages.

The Court will address these claims in turn.

### a. Negligent Handling and Operation of the Train

#### 1. *Duty and Breach*

The leading case in Pennsylvania regarding the duties owed to pedestrians at train crossings is *Moss v. Reading Co.*, 418 Pa. 598, 212 A.2d 226 (1965). In *Moss*, the administrator of the decedent's estate brought a negligence suit against a railroad company, claiming that defendant's train should have slowed or stopped before striking the decedent. *Id.* at 601. At trial the train's engineer testified that he first saw decedent when decedent was approximately 1,500 feet ahead of the train across the roadbed. *Id.* at 600. Once decedent proceeded across a nearby set of tracks, the engineer blew the train's whistle but he did not apply the emergency brake; he thought decedent would stop at the adjacent track, rather than proceeding onto the track upon which the train was traveling. *Id.* at 601. The engineer eventually applied the emergency brake, but only when decedent stepped off of the adjacent track. *Id.* At this point, it was too late to avoid a collision, and decedent was struck and killed. *Id.*

The Pennsylvania Supreme Court affirmed the lower court's judgment of nonsuit in favor of the defendant. The court held that the train operator clearly had "a duty to take emergency measures" as soon as Plaintiff was in a "perilous position." *Id.* at 602. Based on the facts before the court, "[i]t was not until decedent stepped off the center

8

track that the engineman could reasonably have suspected that decedent was in a perilous position." *Id.* at 602-603. The lower court correctly granted a nonsuit in favor of defendant because Defendant applied the emergency brake at the moment that "decedent stepped off the center track" *Id.* at 601 and, "as a matter of law... decedent had not reached a position of peril until he stepped from the center tracks heading for the track on which defendant's train was traveling." *Id.* at 601-02.

In the decades since *Moss*, courts applying Pennsylvania law have affirmed *Moss'* holding that a duty to attempt to stop or slow a train arises when someone is in a "position of peril." *See Manfred v. Nat'l R.R. Passenger Corp.*, 106 F. Supp. 3d 678, 686 (W.D. Pa. 2015); *Marsh v. Norfolk S., Inc.*, No. 3:14-CV-02331, 2017 WL 1049084, at *7 (M.D. Pa. 2017); *Alvin J. Barr, Inc. v. Consol. Rail Corp.*, No. 98 CV 5048, 1999 WL 554598, at *4 (E.D. Pa. 1999).

Plaintiff claims that Defendant violated its duty to slow or stop the train once Plaintiff was in a position of peril. (ECF No. 52 at 25.) Plaintiff claims that Defendant negligently disregarded the "specific identifiable hazard" of Plaintiff walking at a constant pace towards the track, not responding to any of the warnings that a train was approaching. (*Id.*) Plaintiff asserts that since it was clear that he was not responding to the warnings, he was in a "position of peril for some 20 seconds with no action by the crew." (*Id.* at 27.) While Plaintiff admits that the emergency brake was eventually activated, he denies that the brake was engaged as soon as it became clear that Plaintiff was in a position of peril. (ECF No. 53 at 17.)

To support his claim, Plaintiff notes divergent accounts from the crew's members about when the emergency brake was activated. Mr. Rhoads, the train's conductor, stated in his deposition that "we were approximately a third to halfway through [the Crossing] when I placed the train into emergency." (ECF No. 46-8 at 111.) However, the train's engineer testified in his deposition that the conductor did not pull the emergency brake until the train "passed the halfway point of the crossing." (ECF No. 46-9 at 56.)

Defendant argues that it did not violate its duty to Plaintiff. According to Defendant, its duty to slow or stop the train did not arise until Plaintiff stepped onto the track on which the train was traveling, because it was not until that moment that Plaintiff was in a "position of peril." (ECF No. 44 at 19.). Defendant notes that it is undisputed that the emergency brake was applied before Plaintiff physically stepped onto the track on which he was struck. (*Id.* at 20.) Therefore, Defendant claims it did not breach its duty and is entitled to summary judgment on this issue.

Defendant further contends that the conductor pulled the emergency brake "approximately four or five seconds prior to impact with Plaintiff." (ECF No. 46 at 15.) This Court notes, however, that Defendant's expert states that based on video analysis it appears that the emergency brake was activated "approximately three seconds before impact." (ECF No. 46-16 at 126.)

This Court finds no support under Pennsylvania law for Defendant's assertion that Plaintiff was not in a position of peril until he stepped onto the track upon which Defendant's train was approaching. Defendant's argument is inconsistent with *Moss*, where the Pennsylvania Supreme Court held that the plaintiff was in a position of peril

10

once he stepped off of the adjacent track *towards* the track carrying the oncoming train. *Id.* at 601-02.

Furthermore, none of the cases that Defendant cites apply here. For instance, *Sturdevant v. Erie Lackawanna R. Co.*, 319 F. Supp. 732 (W.D. Pa. 1970), aff'd, 458 F.2d 1214 (3d Cir. 1972) is not analogous to this case for several reasons. First, *Strudevant* had a different procedural posture; *Sturdevant* did not grant summary judgment for the defendant train company, but rather affirmed a jury verdict for the defendant. Second, *Strudevant* does not hold that, as a matter of law, one is only in a position of peril when he physically enters the tracks. Rather, the Third Circuit affirmed the lower court's fact-specific finding that, because the car appeared to slow down as if it intended to stop before entering the tracks, "the engineer had a right to rely on the assumption that it would stop before entering the track under these circumstances." *Id.* at 737. Unlike the car in *Strudevant*, Plaintiff never slowed as he neared the tracks or otherwise indicated that he perceived the train. In fact, it is undisputed that Plaintiff made no indication that he realized a train was approaching.

Defendant also points to *Manfred*, 106 F. Supp. 3d 678. But in that case the pedestrian was on the tracks the entire time; he did not approach the tracks as the train neared. Moreover, the decedent in *Manfred* was a trespasser as a matter of law, requiring plaintiff to show willful or wanton conduct. *Id.* at 685. Similarly, *Ginocchietti v. Lehigh Valley R. Co.*, 34 Pa. D. & C. 650, 656 (Com. Pl. 1939), aff'd sub nom. *Ginocchietti v. Lehigh Val. R. Co.*, 338 Pa. 507, 12 A.2d 919 (1940) also dealt with a pedestrian who was already on the tracks as the train approached.

This Court also notes that it finds no support for Plaintiff's contention that Plaintiff was in a perilous position for 20 seconds prior to impact. (ECF No. 52 at 27.) The mere fact that Plaintiff failed to respond to the warning whistles does not mean that he was in a position of peril. *Moss*, 418 Pa. at 602. As stated above, the Supreme Court of Pennsylvania has held that, as a matter of law, a pedestrian was not in a position of peril until he stepped off of the adjacent track *towards* the track upon which the oncoming train was travelling. *Id.* at 601-02.

In sum, this Court finds no authority under Pennsylvania law to support Defendant's assertion that, as a matter of law, Plaintiff was not in a position of peril until he stepped onto the track. However, this Court also finds no support for Plaintiff's contention that Plaintiff was in a perilous position for the entire 20 seconds before he stepped onto the track.

Based on the facts before it, this Court is unable to determine, as a matter of law, when Plaintiff was placed in a position of peril. Thus, this Court is unable to determine, as a matter of law, whether Defendant satisfied its duty to attempt to slow or stop the train.

### 2. *Proximate Causation*

Defendant asserts that it is entitled to summary judgment for lack of causation evidence. (ECF No. 58-1 at 9.) Defendant alleges that Plaintiff has not presented any evidence that the accident could have been averted even if Defendant slowed or stopped when it was under a legal duty to do so. (*Id.*)

12

This Court agrees with the Defendant that Plaintiff has not produced evidence showing that applying the brake earlier would have allowed the train to slow or stop before striking Plaintiff. However, this does not dispose of this issue.

The problem with Defendant's argument is that it assumes that Defendant was not under a legal duty to slow or stop the train until Plaintiff stepped onto the track; according to Defendant, Plaintiff was not in a position of peril until the instant before he was struck. However, as noted above, this Court is unable determine, as a matter of law, the precise moment when Plaintiff was placed in a position of peril. It follows that the question of proximate cause—i.e. whether Defendant could have slowed or stopped the train and avoided the accident once Plaintiff was placed in a position of peril— cannot be answered at present.[3] Moreover, this Court notes that there is a genuine dispute about when the emergency brake was applied.

In sum, based on the record before it, this Court finds that a reasonable juror could conclude that Plaintiff was in a position of peril before he stepped onto the tracks, and that Defendant breached its duty to attempt to slow or stop once Plaintiff was in a position of peril. Therefore, Defendant's motion for summary judgment will be denied in regards to Plaintiff's negligent handling claim.

---

[3] The Court notes that Defendant filed objections to Plaintiff's expert reports offered in support of Plaintiff's motion for summary judgment. (ECF No. 54.) Defendant claims that Plaintiff cited to unsworn opinions of two experts to support his opposition to Defendant's motion for summary judgment. Plaintiff responds by alleging that Defendant waived any objections to the unsworn reports because Defendant introduced those reports into the record. (ECF No. 62.) This Court notes that it need not address the merits of Defendant's objections because this issue is mooted; this Court's decision to deny Defendant's summary judgment motion on Plaintiff's negligent operation and punitive damages claims is not based on any opinions contained in Plaintiff's expert reports.

13

### b. Negligent operation for exceeding the speed limit

Before turning to the merits of Plaintiff's claim, the Court must first address Plaintiff's alternative method for calculating the speed of the train. As noted above, the event recorder data and signaling system data indicate that the train was travelling somewhere in the 11 mile per hour range immediately before the collision. Despite the consistent speed data from these two independent systems, Plaintiff alleges that the actual speed of the train was in excess of 14 miles per hour.

The Court will briefly explain how Plaintiff arrived at this figure. Brent Lewis, a corporate representative for Defendant, stated in his deposition that signal system sensors collect data when the train reaches two locations — a first sensor located before the Crossing, and a second sensor in the middle of the Crossing. Mr. Lewis stated that the first sensor was located "approximately 1,500 feet away from the road," (ECF No. 46-7 at 114), and that the second sensor was "60 feet off the road." (*Id.* at 105.) Based on these approximations of the locations of the sensors, Plaintiff's expert calculated that the distance from the first sensor to the second sensor was 1,400 feet. (ECF No. 46-16 at 6.) Based on the fact that it took the train 69.76 seconds to go from the first sensor to the second, Plaintiff's expert calculates that the train was traveling at 14.07 miles per hour.[4] (*Id.*)

---

[4] Defendant attached an affidavit by Mr. Lewis (ECF No. 46-17) in support of its Concise Statement of Material Facts in support of its Motion for Summary Judgment. In this statement, Mr. Lewis revises the distances figures that he gave during his deposition. Plaintiff contends that Defendant never disclosed this document during discovery, in violation of FRCP 26(a)(1)(A)(ii), and asked this Court to reject the attached affidavit. (*See* ECF No. 53 at 11.) This Court notes that Mr. Lewis' affidavit was dated December 14, 2016, only one day before Defendant moved for summary judgment. Therefore, this Court finds, for the purposes of this

This Court does not credit Plaintiff's expert's estimation of the train's speed.

While Plaintiff speculates that Defendant "acted willfully and deliberately to calibrate

what it admits is a highly sophisticated and accurate automatic warning system to

underreport actual train speed at the [C]rossing" (ECF No. 52 at 4), Plaintiff has not

presented any evidence to support this blanket allegation.[5] Furthermore, Plaintiff has

not come forward with any evidence (other than conjecture and his expert's imprecise

speed-distance calculation) that the event recorder and signal systems were

malfunctioning or not operating properly on the day of the accident. Therefore, for the

purposes of this motion, the Court accepts that the event recorder and signaling system

accurately gauged the train's speed, and that the train was traveling somewhere

between 11.3 and 11.6 miles per hour.

Turning to the merits, Plaintiff claims that Defendant was negligent *per se* for

traveling in excess of 10 miles per hour, the speed mandated for Class 1 tracks under 49

C.F.R. § 213.9. (ECF No. 52 at 16.) Defendant responds by arguing that Plaintiff's speed

claim is preempted because the train was complying with federal law at the time of the

accident. (ECF No. 45 at 15-17.) Specifically, Defendant argues that the 10 mile per hour

---

motion, that Defendant did not comply with FRCP 26(a)(1)(A)(ii). Accordingly, this Court did
not consider Mr. Lewis' revised distance calculations in consideration of Defendant's Motion for
Summary Judgment.

[5] Plaintiff draws this conclusion from the testimony of Timothy Wagner a Commonwealth of
Railroad Safety Division. (ECF No. 53-37 at 17.) Mr. Wagner states that he asked Defendant for
the event recorded data to verify the train's speed, but that Defendant did not provide the data
because it was "too late," as "the event recorded cycles every two weeks" and he made the
request "beyond the two weeks." (*Id.*) Mr. Wagner stated that he does not know whether
Defendant actually downloaded the data from the event recorder (*Id.* at 17), and further stated
that even if Defendant had a download, Defendant "[would not] have to give it to me unless I
have a court order." (*Id* at 17.) No reasonable juror could conclude from Mr. Wagner's
statements that Defendant tampered with the event recorder data.

15

speed limit set by 94 C.F.R. § 213.9 must also be read with 49 C.F.R. § 229.117(a)(1), which requires that trains be equipped with speed indicators that are "accurate within +/- 3 miles per hour of actual speed at speeds of 10 to 30 mile per hour." Defendant contends that because 49 C.F.R. § 229.117(a)(1) permits a "variance" of 3 miles per hour, the "real" speed limit in a 10 mile per hour zone is actually 13 miles per hour, and therefore the speed claim is preempted because the train was only traveling between 11.3 and 11.6 miles per hour, which is below the 13 mile per hour limit.

This Court rejects Defendant's assertion that the "real" speed limit was 13 miles per hour. This Court finds no authority indicating that 49 C.F.R. § 229.117(a)(1) has any bearing on speed limits. In fact, the only federal case that this Court could find directly addressing the issue clearly holds that 49 C.F.R. § 229.117(a)(1) "pertains only to sensitivity, accuracy, and calibration of the train's speedometer," and does not allow a train to travel in excess of the governing speed limit. *Murrell v. Union Pac. R. Co.*, 544 F. Supp. 2d 1138, 1149 (D. Or. 2008).

Because it is undisputed that the train was traveling in excess of the federally-mandated speed limit of 10 miles per hour, Plaintiff's excessive speed claim is not preempted. *Zimmerman v. Norfolk S. Corp.*, 706 F.3d 170, 180 (3d Cir. 2013) (noting that "the speed limits in § 213.9 create a federal standard of care" and holding that plaintiff's "speeding claim is not preempted.").

However, this is not the end of the Court's inquiry. Having found that Plaintiff's excessive claim is not preempted, this Court must still address the merits. As noted

below, no reasonable juror could conclude that the train's excessive speed proximately caused Plaintiff's injuries.

"Negligence per se is not a distinct cause of action but rather an evidentiary presumption that a defendant's violation of a legislative or regulatory enactment constitutes proof of a breach of duty." *Deitrick v. Costa*, No. 4:06-CV-01556, 2015 WL 1605700, at *18 (M.D. Pa. 2015), appeal dismissed (Aug. 31, 2015). "Pennsylvania recognizes that a violation of a statute or ordinance may serve as the basis for negligence per se." *Wagner v. Anzon, Inc.*, 453 Pa. Super. 619, 627, 684 A.2d 570, 574 (1996). To prove liability based on negligence *per se*, "(1) The purpose of the statute must be, at least in part, to protect the interest of a group of individuals, as opposed to the public generally; (2) The statute or regulation must clearly apply to the conduct of the defendant; (3) The defendant must violate the statute or regulation; (4) The violation of the statute or regulation must be the proximate cause of the plaintiff's injuries." *Schemberg v. Smicherko*, 2014 PA Super 23, 85 A.3d 1071, 1074 (2014) (internal citations omitted.) However, in examining negligence *per se* liability, it is important to remember that while "[t]he concept of negligence per se establishes both duty and the required breach of duty… plaintiff still bears the burden of establishing causation." *Deitrick*, 2015 WL 1605700, at *18.

The Court finds that Plaintiff has clearly satisfied the first three elements of negligence *per se*. There can be little doubt that the purpose of the speed limit established by 94 C.F.R. § 213.9 is, at least in part, to protect members of the public from the great danger posed by trains travelling at excessive speeds (element 1). Neither

17

party disputes that 94 C.F.R. § 213.9 applies to Defendant's conduct (element 2).

Furthermore, Defendant was clearly violating the statute because train was travelling in excess of the 10 mile per hour speed limit in the moments before the collision (element 3). However, as described below, Plaintiff has failed to prove that the train's speed proximately caused his injury.

Courts have long rejected excessive speed claims whose theory of proximate causation is that if a train had been traveling slower, the accident would have been avoided because the train would have arrived at the place of the collision after the plaintiff had safely crossed the tracks. *See, e.g., Dombeck v. Chicago, M., St. P. & P. R. Co.,* 24 Wis. 2d 420, 433, 129 N.W.2d 185, 192 (1964) ("Speed is not causal merely because the train arrived at the crossing the instant it did while if it had been going slower the car might have safely crossed ahead of it."); *Barlett By & Through Barlett v. Kansas City S. Ry. Co.,* 854 S.W.2d 396, 400 (Mo. 1993) (rejecting the "mere causation rule," which " would permit finding causation from evidence that the train's speed at a 'remote' point in time 'caused' the train to be at the scene of the accident"); *Rasmusen v. White,* 970 F. Supp. 2d 807, 825 (N.D. Ill. 2013) ("speed is not causal merely because the train arrived at the crossing the instant it did, while if it had been going slower, the [vehicle] might have safely crossed in front of it.") (internal citations omitted); *see also Berry v. Sugar Notch Borough,* 191 Pa. 345, 348, 43 A. 240, 240 (1899) (holding that excessive speed of train was not proximate cause of injuries sustained when tree fell on top of moving train, and stating "[t]hat his speed brought him to the place of the accident at the moment of the accident was the merest chance, and a thing which no foresight could have predicted.").

18

Plaintiff has presented no evidence from which a reasonable juror could conclude that his injury was caused by the excessive speed of the train. Plaintiff's expert stated that if the train were traveling at the speed limit of 10 miles per hour, rather than 11.6 miles per hour, during the last 18 seconds before the collision, Plaintiff would have had approximately an extra 2.46 seconds to get out of the way of the approaching train. (ECF No. 46-16 at 6.) However, this evidence only supports the impermissible "mere causation" theory described above.

Plaintiff has not come forward with any evidence that the proximate cause of the accident was the train's travelling at 1.6 miles per hour over the speed limit. The Court also observes that it is extremely unlikely that an additional 2.46 seconds of warnings would have altered Plaintiff to the approaching train. Plaintiff's expert admits that the horn was sounding for 13 of the 20 seconds before the collision, including 6 of the last 7 seconds before impact. (*See* "Incident Video Timeline," ECF No. 46-16 at 37.) Given that the horn blasts, ringing bells, flashing lights, and stopped traffic did not alert Plaintiff to the presence of the approaching train, this Court can find no reason to think that the extra 2.46 seconds of warnings would have alerted Plaintiff to the danger.

Because Plaintiff has failed to come forward with evidence from which a reasonable juror could conclude that the excessive speed of the train proximately caused his injuries, Plaintiff's excessive speed claim fails as a matter of law.

### c. Negligent Failure to Have Pedestrian Warnings

Plaintiff next claims that Defendants negligently failed to install adequate pedestrian warnings at the Crossing. (ECF No. 52 at 29-32.) Defendant argues that

Plaintiff's inadequate warning claims are preempted under *Norfolk S. Ry. Co. v. Shanklin*, 529 U.S. 344, 352, 120 S. Ct. 1467, 1473, 146 L. Ed. 2d 374 (2000), because the 2007 improvements to the warning devices were paid for with federal funds. (ECF No. 45 at 6-7.) Plaintiff does not dispute that federal funds paid for the 2007 improvements to the Crossing. Instead, Plaintiff claims that his failure to warn claim is not preempted because (1) "no study was conducted regarding the adequacy of pedestrian warnings" and (2) "federal funds were not used for the mast, crossbucks, signal lights or signs, but only for track circuitry to activate traffic signals in conjunction with a nearby highway bridge renovation." (ECF No. 52 at 29.) This Court will address these claims in turn.

Plaintiff's first claim clearly fails. "[A]n individualized determination ensuring the adequacy of warning devices at a particular crossing is not a necessary precondition to preemption." *Strozyk v. Norfolk S. Corp.*, 358 F.3d 268, 275 (3d Cir. 2004), *citing Shanklin*, 529 U.S. at 356. Therefore, the fact that no study was conducted at the Crossing concerning the adequacy of pedestrian warnings has no bearing on the question of preemption.

Plaintiff's second claim fares no better than his first. As the Supreme Court has held, § 646.214(b)(3) and (4) of the Federal Railroad Safety Act of 1970 ("FRSA") "pre-empt state tort claims concerning the adequacy of *all* warning devices installed with the participation of federal funds." *Shanklin*, 529 U.S. at 357 (emphasis in original); *see also Strozyk*, 358 F.3d at 276–77 (noting that *Shanklin* prevents "tort plaintiffs from interposing state law obligations concerning appropriate warning devices...").
Furthermore, once federal fuds have been used," whether the State should have

20

originally installed different or additional devices, or whether conditions at the crossing have since changed such that [additional warnings] would be appropriate, is immaterial to the pre-emption question." *Shanklin*, 529 U.S. at 358; *see also Eubanks v. Norfolk S. Ry. Co.*, 875 F. Supp. 2d 893, 899 (N.D. Ind. 2012) (holding that state tort claims for inadequate pedestrian warnings at a train crossing are preempted when federal funds have been used to upgrade the crossing); *Stuckey v. Illinois Cent. R. Co.*, No. 2:96CV47-B-B, 1998 WL 97270, at *4 (N.D. Miss. 1998), aff'd sub nom. *Stuckey v. Illinois Cent. R.R.*, 162 F.3d 96 (5th Cir. 1998) (holding that "claims for inadequate signalization are preempted by federal law if federal funds have been expended to install, upgrade, or repair the signalization at the crossing in question.").

Plaintiff's inadequate pedestrian warning claims are clearly preempted. It is undisputed that federal funds paid for "installation of the track circuitry for the automatic warning activation" in 2007. (ECF No. 53 at 5.) Defendant has presented evidence in the form of witness testimony, which Plaintiff does not dispute, that the 2007 improvements entailed installing "a new crossing enclosure," i.e. "the silver shed looking structure that... houses all of the control mechanisms for the crossing" (ECF No. 46-7 at 91); renewing "all of the electrical cables... in their entirety" (*Id.*); renewing the "detecting equipment which is contained on the tract structure itself" and "the electrical service at the crossing" (*Id.*); replacing "[t]he foundations for the flashing light structures" (*Id.*); replacing "[t]he actual subgrade device that holds the illuminating structures, the pole, the lights and the crossbuck" (*Id.*); and installing a "predictor... the device which is actually used to detect the approach of a train at the crossing [and is]

used to activate the lights and actually provides the voltage to illuminate the bulb." (*Id.* at 95-96.) Defendant has also presented uncontested evidence that these improvements remain in place today. (*See Id.* at 92.) The 2007 upgrade to the Crossing clearly constituted an improvement of the Crossing's "warning devices." Therefore, Plaintiff's claim that the warning devices at the Crossing were inadequate is preempted.

Plaintiff cites *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 113 S. Ct. 1732 123 L. Ed. 2d 387 (1993) to support his argument that his claim is not preempted. However, *Easterwood* does not apply here. In *Easterwood*, the Georgia Department of Transportation had planned to install a gate at a railroad crossing, but ultimately only installed the motion-detection circuitry for the gate after funds for the project were reallocated elsewhere. *Id.* at 671-72. Other than the motion-detection circuitry, "no other devices were installed." *Id.* at 672. The Supreme Court held that state tort law was not preempted; because the motion-detection circuitry was not connected to any warning device, it did "not meet the definition of warning devices provided in 23 C.F.R. § 646.204(i) and (j) (1992)." *Id.* Unlike the unfinished project in *Easterwood*, the 2007 upgrades to the Crossing included, among other things, replacement and renewal of the electrical systems that allow the existing warning devices to function.

Because this Court finds that Plaintiff's state tort claim regarding warnings is preempted, Defendant is entitled to summary judgment on this issue.

### d. Negligent Maintenance

Plaintiff claims that Defendant negligently failed to maintain the Crossing. (*See* ECF No. 52 at 35.) Specifically, Plaintiff alleges that the location of the crossing warning

sign, the crossbuck, and the warning lights were not positioned so as to inform pedestrians about the approach of oncoming trains. (*See Id.* at 35-38.)

As a threshold matter, this Court notes that claims that a crossing was improperly maintained are not preempted. *Strozyk*, 358 F.3d at 276-77 (holding that while the FRSA "restrict[s] tort plaintiffs from interposing state law obligations concerning appropriate warning devices, the regulations do not eclipse those duties ensuring safe grade crossings that are unrelated to warning devices, such as the duty to keep visibility at grade crossings free from obstructions.").

To support his negligent maintenance argument, Plaintiff cites several cases where plaintiffs had, in fact, alleged that the crossing was negligently maintained. For example, the plaintiff in *Strozyk* alleged that "excess vegetation, which [defendant] had a duty to control, obscured the decedent's view of the oncoming train." *Id.* at 270. Similarly, in *Zimmerman*, 706 F.3d 170, plaintiff alleged that the "warnings had fallen into disrepair" and were obscured by tree branches. *Id.* at 189. However, Plaintiff has not come forward with any evidence—nor has he even alleged—that vegetation or overgrowth obscured his sight line of the oncoming train, or that the existing signs had fallen into "disrepair." More generally, Plaintiff has not presented any evidence that the Crossing was negligently maintained. Plaintiff merely argues that the Crossing was negligently designed; he claims that, because of how the warning devices were positioned, they were not "effective in providing warning to pedestrians." (ECF No. 52 at 37.) Plaintiff further claims that the Crossing should have had a gate, and alleges that "the physical characteristics of the crossing, especially its skewed nature and the

23

significant curve" make it difficult for pedestrians to see down the tracks towards an approaching train. (*Id.* at 38.) As far as this Court can discern, Plaintiff's negligent maintenance claim is merely a repackaged claim that the Crossing lacked adequate warning devices. And, as explained above (*see* Section V(c), *infra*), this claim is preempted.

In sum, while Plaintiff's negligent maintenance claim is not preempted, Plaintiff has not come forward with any evidence from which a reasonable juror could conclude that the Crossing was, in fact, negligently maintained. Therefore, Defendant is entitled to summary judgment on this issue.

### e. Improper Audible Warnings

The parties do not dispute that, under 49 C.F.R. § 222.21, Defendant had a duty to sound the train's horn "with two long blasts, one short blast and one long blast" beginning "at least 15 seconds, but no more than 20 seconds, before the locomotive enters the crossing." 49 C.F.R. § 222.21(a), (b)(2). Defendant states, and Plaintiff does not dispute, that the horn began sounding "sixteen (16) seconds prior to entering the Crossing and 22 seconds before impact with the Plaintiff." (ECF No. 46 at 10.) Additionally, the parties do not dispute that the CSX Transportation Operating Rules ("Internal Guidelines") state that trains approaching a crossing shall issue horn blasts in a staccato pattern and that "[t]his signal is to be prolonged or repeated until the engine or train occupies the crossing." (*See* ECF No. 46-16 at 11-12).

Plaintiff claims that Defendant negligently failed to comply with (1) the horn blast pattern requirements set forth in 49 C.F.R. § 222.21 and (2) the horn blast

24

guidelines set forth in its own internal rules. (ECF No. 53 at 12-13.). Plaintiff also claims

(3) that Defendant negligently failed to provide an additional audible warning during

the emergency situation that arose once Plaintiff neared the tracks. (ECF No. 52 at 33-

35.) The Court will address these claims in turn.

### 1. *Failure to Comply with Federal Horn Pattern Regulation*

To support his first claim that Defendant negligently failed to sound the horn in

accordance with § 222.21, Plaintiff cites to a report by his expert (the "Fulk Report," ECF

No. 46-16.) In the relevant portion of the report, Mr. Fulk states that the "horn signals

were not sounded in the required pattern. The data clearly shows the horn was not

sounded for a period of 7 seconds as the train approached and was in close proximity to

the Ferndale Avenue crossing." (*Id.* at 11.) However, § 222.21 only requires that the

blasts *begin* between 15 and 20 seconds before the train enters a crossing; it does not

require that the blasts themselves last for 15 or 20 seconds. *See Janero v. Norfolk S. Ry.

Co.*, No. 1:13-CV-155-TLS, 2017 WL 993055, at *12 (N.D. Ind, 2017) (argument that the

horn blasts were too short "ignores the plain meaning of 49 C.F.R. §§ 222.21(a) and

(b)(1)(2)."). Plaintiff has not come forward with any other evidence to support his claim

that the audible warnings failed to comply with § 222.21. Therefore, this Court finds

that there is no dispute that Defendant complied with the requirements of § 222.21.

Moreover, the Court notes that even if Defendant failed to sound the horn in

accordance with § 222.21, Plaintiff's claim still would not survive summary judgment.

Plaintiff has not presented any evidence from which a reasonable juror could conclude

that Plaintiff's injury was proximately caused by deviations from the required pattern

of horn blasts. *See Eubanks*, 875 F. Supp. 2d at 904 ("While a jury could find that the sounding of the horn was out of compliance with the regulation (49 C.F.R. 222.21(a)), no reasonable jury could find on this record that the required longer blasts... would have changed the outcome of the incident."); *see also Hughs v. Union Pac. R.R. Co.*, No. 5:15-06079-CV-RK, 2017 WL 1380480, at *5 (W.D. Mo. 2017) (granting summary judgment because "[t]he Court finds it illogical to conclude that a minor deviation from the regulation's pattern caused the collision considering Decedent appeared not to hear any of the horn's 8 blasts in the 17 seconds preceding the collision.")

    *2. Failure to Comply with Internal Guidelines*

Because there is no dispute that Defendant complied with § 222.21, Plaintiff's claim that Defendant negligently failed to follow its Internal Rules is preempted. To avoid preemption, "[i]t is simply not sufficient to allege a violation of the railroad's own rules." *Marsh*, 2017 WL 1049084, at *13 (holding that plaintiff's improper sequence claim was preempted because plaintiff failed to show that a federal regulation mandated the sequence required by the defendant's internal code). While failing to sound the horn for approximately 7 seconds appears to have violated Defendant's Internal Guidelines, Plaintiff has not pointed to any federal statute or regulation that mandates that a train approaching a crossing repeat or prolong its horn blast. *See Id.* Therefore, Plaintiff's claim is preempted. *Id.*

### 3. Failure to Sound Horn in an Emergency

Finally, Plaintiff asserts a claim based upon Defendant's negligent failure to sound the horn in an emergency. Defendant asserts that this claim is preempted. This Court agrees.

Under 49 C.F.R. § 222.23(a)(1), "a locomotive engineer may sound the locomotive horn to provide a warning to... pedestrians... in an emergency situation if, in the locomotive engineer's sole judgment, such action is appropriate in order to prevent imminent injury, death, or property damage." 49 C.F.R. § 222.23(a)(1). The regulation expressly states that it does not impose a duty to sound the horn in emergency situations. *See Id.* at § 222.23(a)(2). Therefore, Plaintiff's claim is preempted. *See Carter v. Nat'l R.R. Passenger Corp.*, 63 F. Supp. 3d 1118, 1157 (N.D. Cal. 2014) (holding that a failure to sound the emergency horn claim "is preempted because 49 C.F.R. § 222.23 gives the train engineer 'sole discretion' as to when it is appropriate to sound the emergency horn and expressly provides that the regulation does not 'impose a legal duty to sound the locomotive horn' in an emergency.").

Plaintiff seeks to avoid preemption by asserting that, by failing to sound the emergency horn, Defendant violated its own internal rules calling for a succession of short horn blasts in the event of an emergency. (ECF No. 52 at 34; *see also* "Fulk Report," ECF No. 46-16 at 11-13.) However, as noted above, "[i]t is simply not sufficient to allege a violation of the railroad's own rules." *Marsh*, 2017 WL 1049084 at *13. Like the plaintiff in *Marsh*, "Plaintiff does not cite to any federal regulation mandating the use of a

27

succession of short sounds." *Id.* Therefore, Plaintiff's claim is similarly preempted. *See Id.*

### f. Punitive Damages

Under Pennsylvania law, "[p]unitive damages may be awarded for conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others." *Hutchison ex rel. Hutchison v. Luddy*, 582 Pa. 114, 121, 870 A.2d 766, 770 (2005), *citing Feld v. Merriam*, 506 Pa. 383, 485 A.2d 742, 747 (1984). "As the name suggests, punitive damages are penal in nature and are proper only in cases where the defendant's actions are so outrageous as to demonstrate willful, wanton or reckless conduct." *Id., citing SHV Coal, Inc. v. Continental Grain Co.*, 526 Pa. 489, 587 A.2d 702, 704 (1991).

"[W]hen assessing the propriety of the imposition of punitive damages, [t]he state of mind of the actor is vital." *Hutchison ex rel. Hutchison*, 582 Pa. at 122 (internal quotations and citations omitted.). "[A] punitive damages claim must be supported by evidence sufficient to establish that (1) a defendant had a subjective appreciation of the risk of harm to which the plaintiff was exposed and that (2) he acted, or failed to act, as the case may be, in conscious disregard of that risk." *Id.* at 124; *see also Scott v. Burke*, No. 2:13-CV-278, 2013 WL 4648402, at *3 (W.D. Pa. 2013) (same). "Determination of an actor's state of mind is generally not resolved on summary judgment." *Guerra v. New Prime, Inc.*, No. 2:11-CV-00020, 2012 WL 2979064, at *3 (W.D. Pa. 2012).

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

As noted above, the jury must determine when Plaintiff was in a position of peril, and whether Defendant satisfied its duty to take emergency measures once Plaintiff was placed in a perilous position. If the jury finds that Defendant failed to satisfy its duty, the jury must also determine whether Mr. Rhodes and Mr. Chubby subjectively appreciated Plaintiff's perilous position and consciously disregarded that risk.

Viewing the facts in the light most favorable to the Plaintiff, this Court finds that a reasonable juror could find that Mr. Rhodes and Mr. Chubby had a subjective appreciation of Plaintiff's perilous position, and failed to act in conscious disregard of that risks. Therefore, there is a genuine issue of material fact as to whether punitive damages are warranted on this issue.

## VI.  Conclusion

For these reasons, the Court will grant Defendant's motion for summary judgment regarding Plaintiff's claims of (1) negligently exceeding the speed limit, (2) negligently failing to have adequate pedestrian warnings, (3) negligent design and maintenance, and (4) negligently failing to issue adequate audible warnings.

The Court will deny Defendant's motion for summary judgment regarding (1) Plaintiff's claim for negligent operation of the train and (2) Plaintiff's claim for punitive damages. Plaintiff's punitive damages claim will be limited to the issue of whether

Defendant's agents, namely the train's operators, Mr. Rhoads and Mr. Churby, had a subjective appreciation that Plaintiff was in a position of peril and consciously disregarded that risk by failing to attempt to slow or stop the train.[6]

Additionally, the Court will deny Defendant's motion to strike Plaintiff's request for summary judgment as moot.

---

[6] The Court notes that Plaintiff alleges at least three additional reasons for why he believes that punitive damages are warranted. While Plaintiff's brief does not clearly distinguish distinct reasons for seeking punitive damages, it appears that Plaintiff alleges that Defendant's consciously disregarded a known risk by: (1) failing to have pedestrian warnings despite knowing that the Crossing was dangerous; and because (2) James Corey Davis, a representative of Defendant, testified that Defendant considers a pedestrian who crosses a public grade crossing once the lights are flashing to be a trespasser; and (3) Defendant knew from previously working with its expert that people often fail to notice or respond to warnings. (See ECF No.52 at 45-50.) However, Plaintiff's warning devices claim is preempted. Furthermore, no reasonable juror could conclude based on Mr. Davis' statements and Defendant's relationship with its expert that Defendant acted recklessly or wantonly.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

JONATHAN LOPEZ,                          )
                                         )
            Plaintiff,                   )        CIVIL ACTION NO. 3:14-CV-257
                                         )
      v.                                 )        JUDGE KIM R. GIBSON
                                         )
CSX TRANSPORTATION,                      )
                                         )
                                         )
            Defendant.                   )

## ORDER

AND NOW, this _13th_ day of September, 2017, upon consideration of the

motion for summary judgment filed by Defendant (ECF No. 44), and in accordance with

the accompanying memorandum opinion (ECF No. 45), **IT IS HEREBY ORDERED** that

the motion for summary judgment is **GRANTED in part and DENIED in part**.

Additionally, it is **HEREBY ORDERED** that Defendant's motion to strike

Plaintiff's request for summary judgment (ECF No. 55) is **DENIED** as moot.

BY THE COURT:

**KIM R. GIBSON**
**UNITED STATES DISTRICT JUDGE**