IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JONATHAN LOPEZ, by his cousin and duly appointed guardian ad litem, RAMONA ILLARAVA | ) ) ) | Case No. 3:14-cv-257 |
| Plaintiff, | ) ) | |
| | ) | JUDGE KIM R. GIBSON |
| v. | ) ) | |
| CSX TRANSPORTATION, INC., | ) ) | |
| Defendant. | ) ) | |

<u>MEMORANDUM OPINION</u>

Before the Court is Defendant CSX Transportation's ("CSXT") "Motion to Remove Plaintiff's *Guardian Ad Litem*" and brief in support.  (ECF Nos. 122, 123)  Plaintiff Jonathan Lopez, by his cousin and duly appointed guardian ad litem, Ramona Ilarrava, has filed a response and brief in support.  (ECF Nos. 129, 130)  CSXT has filed a reply.  (ECF No. 133)  With the Court's permission, Plaintiff's response and Defendant's reply were filed under seal.  (ECF Nos. 128, 132)  Lopez himself has submitted an email to the Court.  (ECF No. 134)  This motion is fully briefed and ripe for disposition.  For the following reasons, the Court **DENIES** CSXT's Motion.

I.      **Background**

        a.  **Procedural History**

        On January 18, 2013, a CSXT-operated train struck Lopez as he crossed rail tracks in Cambria County, Pennsylvania.  (ECF No. 63 at 2–4)  Due to an irretrievable breakdown between Lopez and his counsel, counsel sought to withdraw; the Court granted this request.  (ECF Nos. 89, 92)  Lopez then proceeded pro se.  On February 19, 2019, after nearly five years of litigation, including the resolution of dispositive motions, CSXT moved for a continuance of trial and an

independent medical examination of Lopez based on Lopez's actions toward his counsel, social media posts, and a psychiatric evaluation of Lopez based on those posts.  (ECF Nos. 63, 84)  The Court granted CSXT's motion to continue trial.  (ECF No. 93)  On August 23, 2019, the Court held a pretrial conference, consolidated with argument on CSXT's motion for an independent medical exam.  (ECF No. 99)

On August 23, 2019, the Court granted CSXT's Motion for an independent medical examination of Lopez (ECF No. 84) and ordered Lopez to undergo a medical examination to determine his competency.  (ECF No. 100)  The Court continued trial until March 9, 2020, to permit sufficient time to resolve the issue of Lopez's competency.  (ECF No. 101)  Shortly after the entry of the continuance, Lopez was arrested on criminal charges in the Southern District of New York and detained until December 19, 2019.  (*United States v. Lopez*, No. 19-cr-899 (S.D.N.Y., Dec. 19, 2019)  Due to his detention, Lopez was unable to undergo the medical exam as ordered, and at the pretrial conference on February 10, 2020—at which Lopez did not appear—the Court again ordered Lopez to undergo a medical exam.  (ECF No. 106)  At the pretrial conference, CSXT's counsel informed the Court that Lopez had been posting on social media that he did not intend to continue pursuing this case.  (ECF No. 105)  On February 24, 2020, the Court received Lopez's request for voluntary dismissal with prejudice (ECF No. 108) and on February 26, 2020, CSXT notified the Court that it did not object to Lopez's request.  (ECF No. 109)  To date, Lopez has not undergone the medical examination ordered by this Court to determine his competency.

In its August 23, 2019, order, the Court determined that the circumstances of this case were sufficient to trigger its independent obligation under Federal Rule of Civil Procedure 17(c) to inquire into Lopez's competency.  (ECF No. 100 at 3)  The order stated that the Court would

resolve the issue of Lopez's competency to represent himself following the examination, briefing from the parties, and a hearing. (*Id.* at 3–4) On March 6, 2020, the Court appointed Ramona Ilarrava, Lopez's cousin, as his guardian ad litem for purposes of this action without holding a hearing and without Lopez having undergone the Court-ordered medical examination. (ECF No. 110)

After the appointment of Ms. Ilarrava as Lopez's guardian ad litem, Lopez's former attorney, who had withdrawn, returned to the case on May 28, 2020. (ECF No. 116)

CSXT filed the instant "Motion to Remove Plaintiff's *Guardian Ad Litem*" and brief in support on August 31, 2020. (ECF Nos. 122, 123) Trial in this case is scheduled to begin on November 2, 2020. Plaintiff Jonathan Lopez, by his cousin and duly appointed guardian ad litem, Ramona Ilarrava, filed a response on September 17, 2020. (ECF Nos. 129, 130) CSXT filed a reply brief on September 25, 2020. (ECF No. 133) Lopez himself has submitted an email to the Court dated September 22, 2020:

> Dear judge Kim r Gibson
> I received your memorandum in support of motion to remove Ramona illaraza as guardian to my case. However I do not disagree with the motion. For the following reason Federal Rules of the civil procedure 17 permits for a guardian to be appointed for either a minor or a individual that's incompetent and I am neither. As I stated in past form. I had no acknowledgment of placement of guardian and found to be prudent on the following motion. Before I continue my statement I'm only addressing you because I'm in boredom. My Attorney Nicholas timko whom is dissenting in his opinion but rather enable the incompetency of innovation to the party's in the court room. For the fact of my childhood disadvantages to marginalize my adulthood as I previously stated in past forms. As you already know the contradiction to my representation on the behalf of my attorney for the reason I'm writing you. However it's impertinent of the courts to evaluate and underline me Incompetent with no probable cause. I stated the facts to you and the courts. However you and the courts filter that information of my own documents of argument. All to make my life a living hell. Unfortunately I wish I was incompetent and all to be psychosomatic. Because then

I would have to deal with bullshit.  This situation has over exceeding its date and as left me fatigued and drain of my vest and has place me to be in disgruntlement. I don't have to prove to you or anyone my intellectual capacity. I may not be the smartest person in this world But I'm not stupid.  At this point and time I don't care want you guys want to do close my case or not.  I lost so much because of yous and especially my time. Something you can never replace.  I have nothing further to say. I can't even see at this moment because on the tires blurring my vision.
Do what you guys want
Jonathan Lopez

(ECF No. 134)[1]  This motion is fully briefed and ripe for disposition.

### b.  Lopez's Mental Competency

The Court has received significant evidence regarding Lopez's competency and has had numerous opportunities to observe Lopez and his behavior throughout the duration of this case. The evidence regarding Lopez's competency can be divided into:  (1) Lopez's activity on the internet and social media; (2) the hearing on the motion for an independent medical examination in which Lopez appeared pro se; (3) mental health evaluations of Lopez; and (4) Lopez's written communications with opposing counsel and the Court.

### 1.  Social Media

### (a)  Barcomplaint.com Posting

In an undated post on the website barcomplaint.com, but appearing to have been posted in or after 2017, Lopez posted a rambling and at times incoherent complaint about his attorney in which he acknowledged that he had sustained a brain injury from being hit by the train and, as a result, "had to teach [him]self how to walk speak read and remember things."  (ECF No. 85 at 30) But Lopez stated that his "[h]istory of injury's and [his] history of history is motivation to take

---

[1]  Throughout this Order, the Court does not correct spelling, grammar, or other typographical errors in Lopez's written or oral communications.

advantage of me to try to manipulate the system to label me to be delusional incapable and moronic to those in higher authorities." (*Id.*) Lopez also stated that "[t]he past years I had to deal with human tricks that have been unseen like the adjusting and shortening to my prosthetic causing me discomfort pain and hurt." (*Id.* at 29)

### (b) Facebook

On January 6, 2016, in response to a Facebook comment by his mother, Lopez claimed: "I'm positively sure her Facebook page has been hacked by [his lawyer] as well as Csx transportation to keep my injury case private so I will reach a Financial whole in by benefit by trying to erase my identity and Slandering my character and Who I am." (ECF No. 85 at 51)

On February 14, 2018, Lopez posted a letter on Facebook from his attorney dated January 22, 2016, responding to the questions that Lopez had sent to his attorney. (*Id.* at 32) The letter makes clear that Lopez had accused his lawyer of being employed by, associated with, or paid by CSXT. (*Id.*) Lopez's letter also accused his attorney of trying to kill him and of "putting a hit out" on him. (*Id.*) The letter also referenced an incident in which his attorney went to Lopez's house and Lopez "brandished a gun making threats" and another occasion when his attorney "stopped at [Lopez's] home and knocked on the door, [Lopez] opened [the door] pointed a gun directly at [his attorney] and stated 'get the f--- off my property.'" (*Id.*)

On February 16, 2018, Lopez posted a picture of a document that he signed before a notary on January 22, 2016, about his attorney calling the police after Lopez brandished a gun at him.[2] (*Id.* at 34–36) The statement notes that Lopez had asked his attorney multiple times if he was

---

[2] It is not entirely clear what this document is because Lopez includes a picture of a form signed and notarized saying that it is his statement. However, the document is written in the third-person and in a format normally used in police reports.

trying to kill Lopez. (*Id.* at 34) Lopez stated that "he thanks God For granting him the gift to see behind closed doors." (*Id.*) The statement also quotes Lopez as saying to his attorney that "if you ever again put in a position [of] survival (indicating) kill or be killed. I'll be in Manhattan birds will be chirping people will be walking their dogs before you know it right when you about to open the door to your Law Firm I'm going to blow your f---ing head off." (*Id.*) The statement further noted that "Lopez stated to law enforcement that [his attorney] put out a hit on Mr. Lopez on August 10th 2015." (*Id.*)

The statement also details Lopez belief that a "hit" had been attempted on him. (*Id.*) According to Lopez, he and his roommate were doing laundry at a laundromat and then went to Dollar General. (*Id.*) Lopez waited in the car and noticed cars parked on either side of his car with a white female in her 30s or 40s in one car and a white male in his 30s or 40s in the other car. Lopez moved his car to the corner of the parking lot and "grabbed his firearm and got out of his car and posted himself in front of the Dollar General." (*Id.*) When his roommate came out of the store, they drove back to the laundromat to get their clothes, despite them still being in the washing machine, and Lopez stayed in the car. (*Id.*) Lopez saw the car driven by the white male arrive at the laundromat and Lopez saw what he thought was a gun in the man's pocket when the man got out of his car. (*Id.*) When the man started walking in Lopez's direction, Lopez "got on his defense and placed his hand on the firearm." (*Id.*) The man walked into another store. (*Id.*) Lopez then walked at a fast pace to the laundromat to tell his roommate they needed to go. (*Id.*)

On February 14, 2018, Lopez posted a letter on Facebook from him to his attorney dated March 11, 2016, and accused his attorney of being deceitful and dishonest and of calling the police

to make false accusations against him in order to have him "falsely incarcerated." (ECF No. 85 at 49)  The letter also accused his attorney of using an "illegal notary stamp" and questioned whether his attorney was working on behalf of CSXT. (*Id.*)

Lopez posted a picture of a document that he had obtained from the Johnstown Police Department on Facebook on February 26, 2018. (ECF No. 85 at 38–39)  The document stated that the records he was seeking could not be produced because "it is considered an active investigation" but the document listed six incidents in the police department's system from 2015 and 2016 pertaining to his request.  Lopez commented on an incident from August 22, 2015, that was included on the document where the reason for the incident was listed as "mental health." (ECF No. 85 at 39)  Lopez stated that "i sustain a mild brain injury as I stated on document on June 23, 2017 my history of injury is motivation to take advantage of me and to manipulate the system to label me to be delusional to those in higher authorities and to cover up the fact that my attorney [] called Law enforcement on me on Aug 21 2015." (*Id.* at 39)

On March 1, 2018, Lopez posted on Facebook that on February 27, 2018, he called "internal affairs" in New York City and in Pennsylvania and left messages and stated that he would "call a Law firm for defamation of character for the reason of the Johnstown police report" stating that there was a mental health incident. (ECF No. 85 at 41)  In the same post, Lopez stated that his possessing a gun was evidence that he did not have mental health issues:  "I would not have had the opportunity to point a Gun at [my attorney] because with mentalhealth issues my Gun and my license would have been confiscated." (ECF No. 85 at 41)

On September 30, 2018, Lopez posted a picture of his statement dated April 10, 2018. (ECF No. 85 at 42–45)  The statement included claims that his medical records "have some error's and

misconstrued information." (*Id.* at 45)  Lopez stated that his prosthetic leg was being adjusted as part of one of several "moronic and humanistic pranks" that were being perpetrated against him. (*Id.*)

   After counsel for CSXT discovered Lopez's posts, they notified Lopez's attorney who then spoke with Lopez.  On February 1, 2019, Lopez posted on Facebook that he had said that he was going to shoot his attorney "[h]owever A hit was place out on me all this information has been placed on my Facebook."  (ECF No. 85 at 53)  The next day Lopez posted:

> On the year of 2015 I stated that I was under private investigation by csx which also this information was posted on my Facebook page [my attorney] stated this information to me but was never recorded then on the year of 2012.  Notice the conjunction that a-line with my duration of car tickets from Pennsylvania through New York City which began after the incident with csxt. [My attorney] stated that the defense attorney . . . is concern for [my attorney's] safety and her own.  The definition of concern is to relate to, be about the definition of relate is make or show a connection between.  On past forms I ask· [my attorney] who was he working for because his character and action showed me otherwise.  The truth of the matter will expose its self more rapidly and vividly then what is currently is.

(ECF No. 85 at 55)  Then, on February 5, 2019, Lopez posted newspaper articles about instances of CSX trains hitting and killing people, stating:

> This is how csx direct and order hits by using numbers and label Articles to Communicate with the second party in their own company.  Given instructions and location to the victim.  Example the article on the left it will state 2 hit kill by csx in Philadelphia.  Also given the caliber of weapon 45 or any other caliber for use and the number 7 means to complete.  How csx gets away with it is they would label the victims suicidal and state on the record the victim has taken his own life.  For those that don't know what a hit is it means to pay someone to murder for money.  Notice theirs a red sticker on the front of the train in both photos.  However train 457 is very popular don't you think?  No same two vehicles have the same Vin just like no two of the same firearm have the same Serial number.  Jonathan Lopez.

((ECF No. 85 at 57)  The same day, Lopez posted an article titled "Parents and train engineer testify in civil trial against CSX in 'Midnight Rider' death" and commented:

> If you google pennlive.com you will notice wjac removed the story that occurred with csx and myself of 2013 incident. Question to ask is why? Csxt bribed wjac to remove the story and did so.  I contacted Linsey wards to give my testimony about what occurred on January 18, of 2013 Also to give voice how their was a hit put out on me.  Jonathan Lopez

(ECF No. 85 at 59)  Then, on February 8, 2019, Lopez posted a YouTube link for "Big Pun – How We Roll '98" and commented:

> Facebook as we all know I been under investigation.  Csx Checking my back round Csx and my attorney [] implementing these lyrics toward my life.  On the year of 2012 I worked at korns for a few months at the same time worked as a barber at Cassandra hair Studio in Johnstown Pennsylvania.  One afternoon on the year of 2013 Me and my daughter [] went to the corner store for some snacks one of my clients from the barbershop name Lemmel Dashawn Myers goes by galven approached me given him a hand shake and hi and good bye  The next day he shot and killed someone across the street from my house in Fairfield in the west end.  I had no connection with his act.  However on the same year other incidents occurred.  My cousin . . . had her car parked at my house because it had broke down.  Her and her boyfriend stopped by to pick up the vehicle.  I would at times visit my cousin at her house.  One day on this visit after leaving her house her boyfriend shot at man name Jonathan in his neck and killing his cousin again I had nothing to do with these acts.  Take it in consideration that it's a possibility that csxt and my attorney has implemented these entertainment music towards my life. Bug pun lyrics I been a killer and a drug dealer a bug nigga bug means crazy. Example the mental health form by Johnstown police department.  Big pun lyrics triple 1 million and split it three ways Clean its best for the hit.  Example [my attorney] states a million dollars on form of what my case is worth.  Methodman lyrics blast with out a license on with the bomb.  Example my license to carry firearms.  Listen to the lyrics carefully
> Jonathan Lopez.

(ECF No. 85 at 61)

On February 13, 2019, Lopez posted a screenshot from an iPhone calendar for November 2019 with Sunday, November 3, 2019, selected and the calendar at the bottom stating, "all-day Daylight Saving Time End."  (ECF No. 85 at 63)  Lopez commented on this picture:

> The reasoning to these court deferments is to prolong my case.  November 3 2019 is the expiration date of the civil action complaint.  I just noticed Look in your iPhone calendar notice the calendar say daylight savings time end removed the word daylight.  Just as I stated Csx Using articles and numbers to communicate.  [My lawyer] also share the same conjunction.  That is why [my lawyer] basically waited two years to put in the civil action complaint.  If this is a way of communication the Question that Need to be ask is who is [my lawyer] communicating with?

(*Id.*)  Finally, on February 16, 2019, Lopez posted his response to a letter sent by his attorney in which Lopez stated that "I request from you [] in writing the advising on the behalf of yourself to the court to withdraw from my case . . . you and csx have insulted my intelligence as I stated in past forms to marginalized and categorize me to be moronic and delusional I will not be a pond to your games"  (ECF No. 89-1 at 4)

## 2.  August 23, 2019, Hearing in which Lopez Appeared Pro Se

Lopez appeared pro se and in person at the August 23, 2019, pretrial conference in this case.  At the hearing, the Court considered CSXT's motion for an independent medical examination of Lopez regarding his competency.  (ECF No. 103 at 21–63)

Lopez spoke at length during the hearing.  He acknowledged having a brain injury.  (ECF No. 103 at 23)  He admitted to pointing a gun at his attorney, but justified it because his attorney was going to kill him, which he knew because his attorney had a bulletproof vest on so "[t]hat's how I know a hit was implemented against me."  (*Id.* at 39–40, 55)  Lopez reasoned that "they" planned to create evidence regarding his mental health so that "if success of [his attorney] would

have killed me, they would have put suicide" as the cause of death despite having no history of being suicidal.  (*Id.* at 41)  Lopez stated that, along with his attorney trying to carry out a hit on him, his attorney had also put a hit out on him.  (*Id.* at 40)  As part of the conspiracy, Lopez discussed that the train that hit him also hit and killed two individuals and that specific train was "very popular."  (*Id.* at 52)

Throughout the hearing, Lopez referred to a book that he had read which figured strongly in his thought processes—*Paradigm* by Jonathan Cahn—and that he believed there are supernatural patterns between the ancient past and modern times.  (*Id.* at 42)  Lopez appeared to believe in the existence of some kind of pattern which relates to his life and his actions and that his actions are "God's act and not [his] own."  (*Id.* at 53)  As an example, Lopez explained to the Court that November 3rd is the "expiration of [his] court date" and on an iPhone "it states on the bottom daylight savings time; and if you remove the word saving time, daylight, it will say saving time ends . . . and this is the same exact date of my expiration date of the civil action complaint."  (*Id.* at 53)  And, Lopez explained, he had a calendar showing that his complaint was also originally filed on November 3rd and the "calendar it says, on the bottom of it, which is an article, saving time ends, which has some type of conjunction and relation."  (*Id.* at 53–54)  Another example that Lopez gave was that the book *Paradigm* is written by Johnathan Cahn "[a]nd it's the similarity; and if you think about it, my name is Jonathan and you see a paradigm.  It's a pattern.  His name is Jon and I don't know this gentleman.  I do not know him."  (*Id.* at 54)  Lopez explained that the paradigm theory includes God "us[ing] whoever he feels to – to bring a message to expose that he does exist and God is real; and I believe in him with all my heart."  (ECF No. 103 at 55)

Lopez repeatedly claimed that "CSX us[es] numbers and articles to place out hits on people." (*Id.* at 52)  He claimed that CSXT was "using numbers and articles and then it forwards it to some type of conjunction with my life where it seems like I also use number and articles to put – place a hit out on people." (*Id.* at 53)

Lopez explained that CSXT questioning his competency was part of the broader conspiracy against him.  (ECF No. 103 at 46)  Lopez told the Court that he is "exhausted due to the private investigations and these moronic pranks and tricks that – that the Defendant is stating it's -- it's in my mind." (*Id.* at 55)  He continued, "these are thing that I had to endure, like the adjusting and the shortening to my prosthetics, these pranks to make me feel hopeless and to want to make me want to take my own life." (*Id.*)  Lopez continued to refer to "moronic pranks and tricks" which he has suffered because of both CSXT and his attorney conspiring together.  (*Id.* at 61)  Lopez expressed frustration that he "want[s] these people out of my life.  I'm tired of their private investigation.  I've been under their private investigation since 2013.  This is obscure.  This is – this is obscurity.  You don't even know what these deprivements." (*Id.* at 57)

Lopez denied being responsible for some of his social media posts and for others stated that "there's certain things that was posted due to God, God allowing – God – me hearing God's words."  (ECF No. 103 at 39, 42, 45)  Lopez explained that his social media posts were "an act of God of this paradigm pattern."  (ECF No. 103 at 54)

Lopez also stated multiple times that he was willing to discuss a settlement with CSXT. (*Id.* at 16, 45)

### 3.   Mental Health Evaluations

Despite Lopez refusing to undergo the independent medical examination ordered by this Court, two mental health professionals have conducted recent assessments of Lopez's mental health: Dr. Shannon Edwards and Dr. Debbie Green.

### (a)  Evaluation by Dr. Shannon Edwards

CSXT retained Dr. Shannon Edwards, a Licensed Clinical Forensic Psychologist, to review Lopez's social media posts to determine "whether the Plaintiff evidenced the mental abilities required under the *Dusky* standard related to his competency to participate in his own legal proceedings." (ECF No. 85 at 16–17, 65 (citing *Dusky v. United States*, 362 U.S. 402 (1960)) Dr. Edwards did not interview Lopez and only reviewed Lopez's social media posts. (*Id.* at 65–66) In a report dated February 13, 2019, Dr. Edwards concluded that "the Plaintiff does not sufficiently present the ability to consult with his lawyer with a reasonable degree of rational understanding." (*Id.* at 65) Dr. Edwards stated that "available records demonstrated Mr. Lopez's paranoia, suspiciousness, and other symptomology directly related to his inability to cooperate with his Counsel" and his social media posts "evidenced an individual preoccupied with conspiracy theories, ideations of his Counsel colluding with Opposing Counsel at CSX Transportation, as well as clear perseveration regarding his Counsel's involvement in proceedings against him." (*Id.*) Dr. Edwards concluded that "it is the undersigned's opinion, held to a reasonable degree of psychological certainty, Mr. Lopez is not competent to participate in his own legal proceedings" and "he does not sufficiently present the ability to consult with his lawyer with a reasonable degree of rational understanding." (*Id.* at 66)

### (b)  Evaluation by Dr. Debbie Green

Dr. Debbie Green, licensed psychologist, conducted a psychological evaluation of Lopez's risk of committing violence as part of his criminal case in the Southern District of New York. (ECF No. 129-2 at 2–9) As part of the evaluation, Dr. Green conducted a three-hour clinical interview of Lopez on November 13, 2019. (*Id.* at 2) Dr. Green also interviewed Ramona Ilarrava, Lopez's guardian ad litem and maternal first cousin once removed, and Maria Medrano, Lopez's mother. (*Id.*) Dr. Green also reviewed Lopez's post-arrest interview, the criminal complaint, Dr. Edwards's report, an incident report from the Johnstown Police Department, and Lopez's criminal history. (*Id.*)

During the interview with Dr. Green, Lopez described what Dr. Green characterized as paranoid delusions that began in 2015 in the context of his civil suit with CSXT. (*Id.* at 5) Lopez gave a lengthy account of what he interpreted as an attempted hit on him: "I see both cars pull in at the same time . . . I still wasn't sure this was a hit. I grabbed my gun, put in the holster . . . I see a gun in his pants . . . he looked at the guy across in a jeep; shook head no . . . I called [my attorney] and asked if he tried to kill me, he said no." (*Id.*) Lopez told Dr. Green that he did not believe his life was currently at risk but that he believed that he was still being "watched, constantly stopped by the police, tickets of violation, tickets given deliberately [for what reason?] keep me impoverished, [so I would] drop the case." (*Id.* (brackets in original)) Dr. Green noted that the Johnstown Police Department report from August 2015 stated that Lopez appeared "paranoid about his attorney and others attempting to harm him." (*Id.*) Dr. Green explained that:

> He perseverated on paranoid beliefs regarding individuals involved in his civil case against CSX. For example, he presented a belief that information from his childhood was passed between several people, ultimately reaching his attorney and the attorney for CSX. He described the belief that his attorney in the civil case was motivated to "generalize my character to a monster, predator." Consistent

with his statements during his interview with investigators in September 2019, Mr. Lopez reported that he believes a "hit" was placed on him in 2015.  He claimed that his attorney told him that he "should be happy to be alive and shut the f--- up" and he believes that CSX paid his attorney to lose his case.  He later stated, "they tried to murder me, he [his attorney] was involved with CSX, took money to lose my case."  Similar to his statements to investigators, he reported the belief that CSX used "articles and numbers" to communicate and to "put out hit on others."  Finally, he expressed the belief that "they" tried to find him incompetent to stop him from pursuing the case.  Mr. Lopez denied that he currently feels threatened or at risk of being harmed. He stated, "I don't believe CSX will try to murder me, because I exposed everything on Facebook, Youtube . . . my testimony is posted."  As noted above, he expressed the belief that CSX has continued to monitor him and that "CSX has a lot of power, federal, personal favors that can be done."

(*Id.* at 6)

Dr. Green also included excerpts from Lopez's post-arrest interview with law enforcement.  (*Id.* at 5)  In it, Lopez stated that:  he believed a hit was put out on him in August 2015; that "they tried to attempt murder on me, state suicide" by filing a "false police report" in 2015; that he bought a bullet proof vest and gun "due to threats of my attorney against me"; that "they use numbers and articles to put out hits on people . . . to murder people"; and that his arrest in New York was as a result of his civil case because he was scheduled to return to court on his civil case. (*Id.*)

Lopez's mother's and cousin's statements to Dr. Green about Lopez's behavior were consistent with the other information she reviewed.  Both his mother and cousin noted significant changes in Lopez's mood and thinking after he was hit by the train and that, since the accident, he isolated himself, appeared hopeless, displayed periods of anger, and expressed paranoid beliefs.  (*Id.* at 4)  In particular, his paranoid beliefs were that his lawyer was not helping him, that the "train people were following him, that they knew his every move," and that "CSX would

send people, cause him to lose his job." (*Id.* at 5)  Both said that Lopez had become "'consumed'

by his beliefs regarding his lawyer and those involved in his civil case." (*Id.* at 4)

>About Lopez's thought process, Dr. Green noted:
>
>[Lopez's] thinking was tangential and perseverative  His thinking was tangential and perseverative. His speech also contained a number of neologisms (i.e., non-sensical words). For example, when describing the interventions he used to improve his mood in the past, he stated, "I work out, talk a walk, so I don't stay and pede to that prospincity."  He also used language in an illogical way. For example, when asked how the problems with his attorney in his civil case began, he stated, "he exposed his cynical implementation of impertinent treatment" and "he knows how much my case is worth.  I learn simplicity of information."

(*Id.* at 5–6)  Lopez also "displayed problems with concentration," struggled to spell five-letter

words backwards, required multiple repetitions of instructions to complete a task to repeat

sequences of numbers backwards, and was unable to recall any of four words presented after a

delay. (*Id.* at 7)

Dr. Green concluded that "it is the evaluator's clinical opinion that Mr. Lopez developed

a psychotic disorder in the aftermath of being struck by a train in 2013." (*Id.*)  Dr. Green noted

that Lopez had "developed delusional beliefs, primarily focused on the various legal personnel

and the transportation company involved in his civil lawsuit following this accident" and Lopez

"expresses paranoid beliefs that information about him has been passed along to others in order

to discredit him, that his lawyer was part of a plot to have him killed to force him to drop his

lawsuit, and that he was followed, monitored, and deliberately targeted by police at the behest of

the transportation company." (*Id.*)  In addition, Dr. Green concluded that Lopez "lacks insight

into the nature of his mental illness and, in fact, has incorporated evaluations of his mental state

. . . into his delusional belief system." (*Id.*)  Further, Lopez's "thinking is at times disorganized, marked by tangential thought process and odd use of language." (*Id.*)

Dr. Green concluded that "[g]iven the lack of evidence of psychotic symptoms prior to suffering head trauma and other injuries and the reported changes in his functioning after his accident, his presentation appears most consistent with a diagnosis of Psychotic Disorder due to head trauma, with delusions (DSM 5 293.81)." (*Id.*)  Dr. Green also concluded that Lopez has suffered from "symptoms of depression, including depressed mood, diminished motivation, social isolation, reduced self-care, changes in his sleep and appetite, and feelings of hopelessness." (*Id.*)  Dr. Green did not have enough information to determine whether a diagnosis of Persistent Depressive Disorder or Major Depressive Disorder was appropriate, so she instead diagnosed Lopez with "Unspecified Depressive Disorder (DSM 5 311)." (*Id.*)  Dr. Green characterized Lopez as having a "major mental illness" and concluded that his "delusional beliefs and psychotic illness tend to be chronic." (*Id.* at 8)

Dr. Green recommended that Lopez receive "psychiatric and psychological treatment" and that "he would benefit from treatment with anti-psychotic medications and from cognitive behavioral therapy to provide him with psychoeducation about his mental illness, potential benefit from psychotropic medications, help him challenge the veracity of his beliefs, and develop strategies to cope with symptoms of depression." (*Id.*)

### 4.   Messages from Lopez to CSXT and the Court

Throughout the case, when both appearing pro se and when represented by counsel, Lopez has sent emails and letters to opposing counsel and to the Court.

In a document titled "Motion to dismissal," dated February 15, 2020, and filed with the Court on February 24, 2020, Lopez, appearing pro se, sought to dismiss the action with prejudice and stated: "[i]n support of the motion, Plaintiff states motion for dismissal for no attendance to appear in trial for court scheduled any mdate."   (ECF No. 108)   On March 17, 2020, Lopez submitted a statement to the Court:

> This is a attachment to my statement of a second page for request to motion for dismissal and withdrawal in part of myself Jonathan Lopez.  My reasoning for dismissal is for the matter that i will not be attendance in court as i stated.  Also i have no desire of driving 6 hours to court.  I honestly just wanted a dismissal and to move forward with myself.  I have to find employment wherefore my focus remains.  If csx would ever offer any amount of reimbursement with no obligation to your giving God bless you.  In my appearance of no attendance to a argument in court to my decision in chance to compensation Csx is remission

(ECF No. 112)  On March 23, 2020, Lopez emailed counsel for CSXT:

> Ms Kendra I would in my interest would you come to a agreement in a structured settlement of still in offer in part of my dismissal to a trial for no continuance.  If you can please send me your feed back thru email of form.

(ECF No. 123-1 at 2)  Also on March 23, 2020, Lopez submitted a letter to the Court stating:

> Dear Mr. Judge Kim r Gibson
> I would like to know if the defendant would come to a agreement in a structured settlement of still in offer in part of my dismissal to a trial for no continuance.  If it's a possibility can you please forward this form to attorney Kendra smith.
> Thank you

(ECF No. 114)  He followed up with another email to counsel for CSXT on March 25, 2020:

> Ms. Kendra to where there would be no misconstrued information in my dismissal statement I would like to make clear.  i did receive your form in no dispute to a argument on your part in my decision of no attendance And my request for dismissal is not wherefore we came to a agreement to a settlement.  Again I just wanted to be clear in my statement.

(ECF No. 123-1 at 3)  But then on March 30, 2020 Lopez wrote:

> Dear Kendra smith
> In giving thought I Jonathan Lopez is given Ramona illarraza authorizations to be a delegate in part of myself to this case. I will not be in attendance to trial on July. if any structural settlement or settlement is in offer it will be expected by me and appreciated. If not it's ok I just want a complete dismissal You will no longer here from me. God bless

(ECF No. 129-3 at 2)  Lopez again emailed counsel for CSXT on May 26, 2020:

> Dear: attorney Kendra smith
> I Jonathan Lopez is writing you to inform you and the courts that my claim in this suit be dismiss in part of myself. However given the narrative of this accident with myself and CSX. On the behalf of myself in fault of the accident that occurred. For the reasoning I was not attentive in cautionary of the train crossing. Me walking into a incoming train was no one fault for also my request for dismissal with respect to the court that my request be granted.
> Sincerely Jonathan Lopez

(ECF No. 123-1 at 4)  Lopez followed-up on May 28, 2020, by emailing counsel for CSXT a picture of a Stipulation of Voluntary Dismissal document signed by him.  (ECF No. 123-1 at 7)   In response to CSXT's motion to remove Lopez's guardian ad litem, Lopez emailed the Court.  (ECF No. 134)  Finally, in response to receiving a subpoena from counsel for CSXT, Lopez replied to the Court:

> To Judge Kim R. Gibson
> I Jonathan Lopez is writing you to inform you in a brief statement. That I receive a subpoena in part of defendant of CSX Attorney Kendra Smith. In appearance to trial on November 2, 2020. However I will not be in attendance. In all honesty this has be a 7 year argument with the company of CSX. I founded to be fatigued You may dismiss my claim and remission the company.
> Jonathan Lopez

(ECF No. 197)

## II.   Discussion

### a.  The Parties' Arguments

CSXT argues that this Court erred when it appointed a guardian ad litem for Lopez.  CSXT contends that the appointment was improper because: (1) the Court used the wrong standard for appointing a guardian ad litem; (2) the Court did not comply with the procedures for appointing a guardian ad litem under New York law; (3) there was no finding that Lopez is incompetent; and (4) the Court violated Lopez's due process rights by not holding a hearing before appointing a guardian ad litem.  (ECF Nos. 122, 123).  Lopez's guardian ad litem contends that: (1) the Court's appointment of a guardian ad litem was proper under Rule 17(c) and New York law; (2) CSXT should be estopped from claiming Lopez is competent because it previously asserted that he was incompetent; (3) CSXT lacks standing to assert Lopez's rights; (4) Lopez has not challenged the appointment of his guardian ad litem and has consented to the appointment of his guardian ad litem; (5) the Pennsylvania Department of Human Services has a statutory right to file a direct claim and removing the guardian ad litem and allowing Lopez to dismiss his claim would prejudice the department; and (6) if the Court believed that the guardian ad litem was improperly appointed, the appropriate remedy would be for the Court to hold a hearing about whether a guardian ad litem should be appointed.  (ECF Nos. 129, 130)

    **b.**  **CSXT Lacks Standing to Object to the Appointment of Lopez's Guardian ad Litem and Lopez Himself has not Raised the Issue**

        **1.**  **CSTX's Lacks Standing to Object to the Appointment of Lopez's Guardian ad Litem**

As a threshold matter, Lopez's guardian ad litem contends that CSXT lacks standing to challenge the Court's appointment of a guardian ad litem for Lopez and to assert Lopez's due process rights on his behalf.  (ECF No. 129 at 3)  CSXT contends that it has standing because it has

an interest in ensuring the finality of the outcome of the case and Lopez could later contest any judgment or settlement by contesting the appointment of his guardian ad litem.  (ECF No. 133 at 8–9)  Lopez's guardian ad litem also contends that CSXT should be estopped from challenging the appointment of Lopez's guardian ad litem because CSXT previously asserted that Lopez was not competent.  (ECF No. 129 at 3)  CSXT contends that it did not previously argue that Lopez was incompetent, but only that an inquiry into his competency was necessary.  (ECF No. 133 at 5)

### (a) Standing

"Generally, litigants in federal court are barred from asserting the constitutional rights of others."  *In re PWS Holding Corp.*, 228 F.3d 224, 248 (3d Cir. 2000) (quoting *Kane v. Johns-Manville Corp.*, 843 F.2d 636, 643 (2d Cir. 1988)).  "The purpose behind appointing a guardian is to protect the interests of the incompetent person, not the [the other party]."  *Richards v. Duke Univ.*, 166 F. App'x 595, 599 (3d Cir. 2006).  Further, in determining whether to appoint a guardian ad litem, a court is not to consider additional costs or expenses that the opposing party might incur as a result.  *See id.* at 598–99.  CSXT provides no authority, and the Court is not aware of any, that a party may assert the opposing party's right to due process on that opposing party's behalf.  Nor does CSXT provide any authority for the proposition that it has standing to challenge the appointment of a guardian ad litem for the opposing party, merely because:  the appointment of the individual over whom the guardian is appointed may appeal; it would incur additional costs and expenses; and final resolution of the case would be delayed or uncertain pending resolution of the appeal.  The Court's removal of Lopez's guardian ad litem would also give Lopez or his

guardian grounds to challenge the Court's removal of his guardian ad litem.[3]  Indeed, had the

Court refused to consider the issue of Lopez's competence, Lopez would also have grounds for

an appeal.  It would be anomalous that costs and expenses incurred during a potential appeal, as

well as uncertainty in the outcome while pending appeal, would be improper considerations for

determining whether to appoint a guardian ad litem, but that they are also sufficient to establish

standing to challenge the appointment of a guardian ad litem.  Fundamentally, it would conflict

with the purpose of appointing guardians ad litem—to protect the interests of the incompetent

person—if the adverse party could challenge the appointment of the guardian ad litem under the

guise of protecting the rights of the incompetent person.  This is especially true in the situation

where, as here, the incompetent individual wants to voluntarily dismiss his case with prejudice.

In such a circumstance, the adverse party cannot be expected to be motivated solely by the best

interests of the incompetent person.  Accordingly, the Court finds that CSXT lacks standing to

challenge the appointment of Lopez's guardian ad litem.

### (b) Estoppel

Judicial estoppel bars a litigant from asserting a position inconsistent with one that the

litigant has previously taken before a court.  *Montrose Med. Grp. Participating Sav. Plan v. Bulger*,

243 F.3d 773, 779 (3d Cir. 2001).  Three requirements must be met for judicial estoppel to apply:

(1) the party to be estopped must have taken two positions that are irreconcilably different; (2)

the party must have changed position in bad faith; and (3) judicial estoppel must be tailored to

address the harm identified.  *Id.* at 779–80 (citations omitted).

---

[3] It is unclear to the Court how Lopez could challenge any settlement or judgment here if, as CSXT asserts, Lopez would dismiss the case with prejudice if his guardian ad litem were removed.

The Court finds that the requirements for judicial estoppel are not met. CSXT did not previously assert that Lopez was incompetent, but that Lopez's social media posts "raise questions about Mr. Lopez's continued sanity" and that an independent medical examination "has to be done" in order to determine whether Lopez is competent. (ECF Nos. 85 at 14–16; 103 at 38) Because contending that an inquiry into Lopez's competency is needed to be done is not irreconcilably different with arguing that Lopez is competent, estoppel does not apply.

### 2. Lopez does not Object to his Guardian ad Litem

Lopez's email to the Court in response to CSXT's motion is largely incoherent. It could arguably be read as him objecting to the appointment of a guardian ad litem. (ECF No. 134 (stating that he received CSXT's motion to removed his guardian ad litem and stating, "[h]owever, I do not disagree with the motion.")) In his email, Lopez contends that he is competent. (ECF No. 134) However, in the same email Lopez states that "[a]t this point and time, I don't care want you guys want to do close my case or not" and "[d]o what you guys want" which can be construed as Lopez stating that does not object to the appointment of his guardian ad litem. (ECF No. 134) Lopez's previous messages suggest that he does not understand the import of his case being dismissed, and that believes that accepting the appointment of a guardian ad litem and his case being dismissed are either one in the same or not inconsistent with one another (i.e., that the case would be dismissed with respect to him and he would no longer be involved in the case, but his guardian ad litem would continue litigating the case on his behalf). (ECF No. 129-3 at 2) The Court finds that, read as a whole, although Lopez believes he is

competent,[4] he does not challenge the appointment of his guardian ad litem.[5]  Further, Lopez's message in response to receiving a subpoena does not address the appointment of his guardian ad litem; rather, Lopez is conveying that he will not be attending trial because he is fatigued and expressing that the Court "may dismiss" his claim.  (ECF No. 197)  Therefore, although Lopez expresses indifference to whether the case is dismissed, the Court finds that Lopez does not object to his guardian ad litem.[6]

### c.  Procedures for Determining Competency

CSXT contends that a hearing was required before the Court could appoint Lopez a guardian ad litem under Federal Rule of Civil Procedure 17(c), New York law, and the due process clause.  (ECF Nos. 123 at 2–9; 133 at 1–5)

### 1.  A Hearing was not Required Prior to Finding Lopez Incompetent and Appointing a Guardian ad Litem

---

[4]  As discussed below, Lopez has incorporated the Court's inquiry into his competence into his paranoid delusions and it appears that his insistence on his competence is itself motivated by his delusional beliefs, as is his desire to dismiss the case.

[5]  In his email, Lopez also does not object to the possible removal of his guardian ad litem.  Instead, he does not provide a position beyond not wanting to be involved in the case and permitting "you guys"—the Court, CSXT, and his guardian ad litem—to continue to litigate the case without his further involvement.

[6]  The Court also finds that, even if Lopez objects to the appointment of his guardian ad litem, he has waived his right to challenge the appointment of a guardian ad litem by repeatedly refusing to undergo the Court ordered independent medical examination.  Assuming Lopez is competent, his refusal to attend the independent medical examination in violation of the Court's order is the direct reason why there is no evidence in the record showing that he is competent.  Lopez cannot both refuse to undergo the medical evaluation and claim, without evidence, that he is competent once an inquiry under Rule 17(c) becomes necessary.  On the other hand, if Lopez is not competent, then his refusal cannot be held against him.  *See United States v. 30.64 Acres of Land, More or Less, Situated in Klickitat Cnty., State of Wash.*, 795 F.2d 796, 805 (9th Cir. 1986) ("Quite obviously an incompetent person cannot be held to compliance with technical rules.").

**(a) Rule 17 does not Require a Hearing**

Rule 17(c) does not provide procedures for how a Court is to determine whether a litigant is incompetent.  Further, there is no uniform approach for how a court is to determine a litigant's competency in civil cases.  *Snider v. Penn Dep't of Corr.*, No. 15-951, 2019 WL 4793056, at *10 (M.D. Pa. Sept. 30, 2019).  The Third Circuit has not explained how district courts are to analyze a Rule 17(c) claim.  *See id.* at *6.  District courts in the Third Circuit have been inconsistent about whether to hold a hearing.  Some courts have reviewed medical reports and concluded that a hearing was unnecessary.  *See Giles v. Pumphrey*, No. 13-1065, 2014 WL 1510428, at *2 (D. Del. Apr. 15, 2014); *Fladger v. Trenton Psychiatric E. 2 Treatment Team*, No. 12-5982, 2013 WL 3271018, at *3–4 (D.N.J. June 27, 2013).  One court relied solely on the litigant's statements without holding a hearing.  *See Kostyshyn v. Morgan*, No. 13-364, 2014 WL 1466599, at *8 (D. Del. Apr. 15, 2014).  Another court considered the litigant's statements and medical reports without holding a hearing.  *See Snider*, 2019 WL 4793056, at *9.  Yet another court considered the litigant's statements and medical reports but also held a hearing.  *Jackson v. Penn. Dep't of Corr.*, No. CIV.A. 14-1604, 2015 WL 2345609, at *4 (W.D. Pa. May 15, 2015).  Thus, although there is no standard practice in this Circuit about whether a hearing should be conducted, there is no requirement that a hearing must be conducted.  Other courts have held that a hearing is not required under Rule 17(c) before appointing a guardian ad litem.  *See Bowen v. Rubin*, 213 F. Supp. 2d 220, 225 (E.D.N.Y. 2001); *see also Thomas*, 916 F.2d at 1035; *Neilson v. Colgate-Palmolive Co.*, 199 F.3d 642, 652–53 (2d Cir. 1999).  Accordingly, the Court finds that Rule 17 does not require that a hearing be held prior to appointing a guardian ad litem.

**(b) Due Process does not Require a Hearing Under These Circumstances**

"Because a litigant possesses liberty interests in avoiding the stigma of being found incompetent, and in retaining personal control over the litigation, the Due Process Clause of the Fifth Amendment limits the district court's discretion with respect to the procedures used before appointing a guardian ad litem." *Neilson*, 199 F.3d at 651 (citing *Wisconsin v. Constantineau*, 400 U.S. 433, 437 (1971)).  To determine the amount of process due, the court must weigh:  (1) the private interest affected by the official action; (2) the risk of an erroneous deprivation of that interest through the procedures used, and the probable value of additional or different procedural safeguards; and (3) the government's interest.  *Id.* (citation omitted); *see also Mathews v. Eldridge*, 424 U.S. 319, 334–35 (1976).

The private interests affected include Lopez's liberty interests in avoiding the stigma of being found incompetent and in retaining personal control over the litigation.   Under the circumstances, neither interest is particularly weighty.   Any stigma to Lopez from being found incompetent is likely to be minimal under the circumstances.   First, Lopez's incompetency has been attributed to head trauma; the same head trauma on which his claim is based.   (ECF No. 129-2 at 7)  A clear and concrete medical basis for his incompetency, coupled with a diagnosis to that effect, would likely lessen any stigma associated with a finding of incompetency because it provides an understandable explanation for the incompetency determination.   Second, Lopez's social media posts in which he repeatedly detailed his paranoid delusions were made publicly available by Lopez himself.   Compared with the stigma from these publicly available social media posts, any additional stigma from the Court finding him incompetent is minimal.   Thus, although Lopez has an interest in avoiding stigma associated with being found incompetent, under these circumstances the interest is not particularly strong.

Lopez's interest in retaining control over the litigation is also minimal.   Lopez is the plaintiff, so he does not risk losing his liberty or property if the suit is unsuccessful.   CSTX contends that Lopez has the right to control the litigation and that, if he could control the litigation, he would dismiss the case.   (ECF No. 122 at 1, 4)   This would end his potentially meritorious cause of action—it survived a motion for summary judgment—because the statute of limitations has run on his claims.   *See* 43 Pa. Cons. Stat. § 5524.   In addition, any decisions Lopez makes regarding the litigation are most likely themselves motivated by Lopez's paranoid delusions.   Therefore, while Lopez has an interest in controlling the litigation, the interest is minimal given that his actions regarding this litigation are motivated by his paranoid delusions.

Finally, among Lopez's numerous and contradictory communications to counsel and the Court, Lopez has stated that he accepts the appointment of his guardian ad litem, indicating that he accepts the stigma and lack of control of the litigation.   *See Bowen*, 213 F. Supp. 2d at 224 (stating that a litigant consenting to the appointment of a guardian ad litem shows that the litigant is "willing to constrain [his] control over this litigation and face the possible resulting stigma associated with guardianship").

The second consideration is the risk of an erroneous deprivation of those interests through the procedures used, and the probable value of additional or different procedural safeguards. *Mathews*, 424 U.S. at 335.   The erroneous deprivation here would be the Court finding Lopez incompetent for purposes of this litigation and appointing a guardian ad litem when he is, in fact, competent.   "[D]ispensing with a formal hearing prior to appointing a guardian ad litem presents only a small risk of an erroneous deprivation." *Neilson*, 199 F.3d at 652.   The Court finds that the risk of erroneous deprivation by not having a hearing is minimal and that holding a hearing

would not mitigate the risk. The main cause of the risk of Lopez being erroneously found incompetent is Lopez's refusal to submit to the Court ordered independent medical examination. Assuming Lopez is competent, then it is within Lopez's control to mitigate against this risk by submitting to the Court ordered independent medical examination. In comparison, a hearing would do little to lessen the risk of erroneous deprivation. The Court has observed Lopez over several years while he represented himself, in his filings, and through his social media posts that the parties have provided to the Court. The Court also has the benefit of reports from Dr. Edwards and Dr. Green. The evidence regarding Lopez's competency uniformly points toward him being incompetent for purposes of this litigation in terms of acting in his own best interest and protecting his rights.

There is no indication that Lopez would be able to present anything further at a hearing that he has not already had the opportunity to present. Lopez provided a response to CSXTs' motion and it is contradictory, incoherent, and unintelligible. (ECF No. 134) This is consistent with his previous filings with the Court. In addition, Lopez had the opportunity to argue orally at a hearing regarding his competency and address the issue of his competency when the Court was deciding whether to order him to undergo an independent medical examination, and he addressed the issue of his competency at length during the hearing. At the hearing, Lopez was similarly incoherent and preoccupied with his various conspiracy theories about CSXT and this litigation. There is no indication that holding another hearing on his competency would result in anything other than him repeating these same theories.[7] Therefore, under the circumstances, a

---

[7] Lopez has expressed his desire to not be further involved in this case, so he would likely not participate in the hearing if one were held. (ECF Nos. 134, 197)

hearing would be of little to no value in mitigating the risk of Lopez being erroneously found incompetent.

The Court further finds that holding a hearing on the issue of appointing a guardian ad litem would be futile and a waste of time and judicial resources. "[D]ue process is flexible and calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972). "The opportunity to be heard must be tailored to the capacities and circumstances of those who are to be heard." *Goldberg v. Kelly*, 397 U.S. 254, 268–69 (1970). The Court has overseen this case for over five years, has reviewed numerous writings of Lopez—including his internet postings and filings with this court—he has represented himself pro se before the Court, and two medical experts have evaluated him. (ECF No. 103) The Court is adequately familiar with what Lopez would have to say at such a hearing and finds that it would be unhelpful and futile.[8]

The government has an interest, expressed through Rule 17, in protecting the interests of incompetent persons. *See Richards*, 166 F. App'x 599.

---

[8] CSXT argues that the Fifth Circuit has stated that a hearing is required. *See Thomas v. Humfield*, 916 F.2d 1032 (5th Cir. 1990). In *Thomas*, the Fifth Circuit conflictingly stated that "due process mandates some type of hearing" before appointing a guardian ad litem and, in the same paragraph stating that "at a minimum, [the individual] should have been given notice and an opportunity to be heard." *Id.* at 1034. The court explained that "providing a litigant the opportunity to review and rebut his opponent's allegations and to introduce written or testimonial evidence of his sanity would not unduly burden the district court and would improve the accuracy of its determination." *Id.* Even if *Thomas* were binding on the Court, it does not require a full evidentiary hearing. Rather, the individual must have the opportunity to review and rebut his opponent's allegations—which Lopez has done (ECF No. 134)—and the opportunity to introduce evidentiary or testimonial evidence. Lopez received notice of the appointment of a guardian ad litem and of CSXT's current motion. Further, Lopez has offered no evidence on this issue (other than his own statements), has not indicated he had any evidence to offer, and has refused to obey the Court's order that he undergo a psychological evaluation. Thus, Lopez has received adequate notice and an opportunity to be heard.

Accordingly, the Court finds that under the circumstances of this case, the Due Process Clause does not require an evidentiary hearing, either prior to the appointment of a guardian ad litem or post-appointment of a guardian ad litem.

### 2. The Procedures Under New York Law do not Apply to an Incompetency Determination under Rule 17(c)

Although the Court is to follow state substantive law in making the competency determination, it is not bound by state procedures in making that same determination.[9] *See Gibbs v. Carnival Cruise Lines*, 314 F.3d 125, at 134–35 (3d Cir. 2002) (stating that "state rules regarding the appointment of guardians ad litem are procedural and therefore do not apply"); *Cohen v. Office Depot, Inc.*, 184 F.3d 1292, 1296 (11th Cir. 1999), *vacated in part on other grounds*, 204 F.3d 1069 (11th Cir. 2000) (explaining that "if the state law conflicts with a federal procedural rule, then the state law is procedural for *Erie/Hanna* purposes regardless of how it may be characterized for other purposes"); *Thomas v. Humfield*, 916 F.2d 1032, 1035 (5th Cir. 1990) ("[W]e reject the notion that in determining whether a person is competent to sue in federal court a federal judge must use the state's procedures for determining competency or capacity."); *Zolnierz v. Arpaio*, No. CV-

---

[9] Even if it applied, there is no requirement that a hearing be held prior to the appointment of a guardian ad litem under New York Civil Practice Law and Rules § 1201. Although a hearing is required to appoint a general guardian under Article 81, the hearing does not have to be conducted in the presence of the person alleged to be incapacitated if the person alleged to be incapacitated "physically cannot come or be brought to the courthouse" and either (1) "the person is not present in the state" or (2) "all the information before the court clearly establishes that (i) the person alleged to be incapacitated is completely unable to participate in the hearing or (ii) no meaningful participation will result from the person's presence at the hearing." N.Y. Mental Hyg. Law§ 81.11(c). Lopez is on pretrial release in a different state and the Court finds that no meaningful participation would result from his presence. Thus, any hearing here under Article 81 would be a mere procedural formality with the parties presenting the same evidence and arguments that they have already presented.

11-00146-PHX-GMS, 2013 WL 253870, at *1 (D. Ariz. Jan. 23, 2013) ("The procedure for determining competence [under Rule 17(c)] is governed by federal law."); *see also Neilson*, 199 F.3d at 663 n.4 (Sotomayor, J, dissenting) (stating that, although the federal court should follow state procedures that "have a sound basis in logic and experience" for appointing a guardian ad litem, the "precise procedure for appointing a guardian ad litem is left to the district court's discretion").

### d. The Appointment of Lopez's Guardian ad Litem was Proper Because Lopez is Incompetent Under Rule 17(c)

Although the Court has found that CSXT lacks standing to challenge the appointment of a guardian ad litem for Lopez, and that Lopez is not challenging the appointment of his guardian ad litem, the Court finds that even if CSXT had standing or Lopez were challenging the appointment of his guardian ad litem that the appointment of Lopez's guardian ad litem was appropriate because Lopez is incompetent under Rule 17(c).

#### 1.  Federal Rule of Civil Procedure 17(c)

Rule 17(c) obligates this Court to appoint a guardian ad litem to protect an unrepresented party litigating before it who is incompetent.  Fed. R. Civ. P. 17(c)(2) ("The court must appoint a guardian ad litem—or issue another appropriate order—to protect a minor or incompetent person who is unrepresented in an action.").  "The purpose behind appointing a guardian is to protect the interests of the incompetent person, not the [other party]."[10]  *Richards*, 166 F. App'x at 599.  Decisions to appoint a guardian ad litem under Rule 17 generally rest soundly within the

---

[10]  New York's public policy for appointing guardians ad litem is to "afford 'rigorous protection of the rights of the mentally infirm.'"  *New York Life Ins. Co. v. V.K.*, 711 N.Y.S.2d 90, 94 (N.Y. Civ. Ct. 1999) (quoting *Vinokur v. Balzaretti*, 403 N.Y.S.2d 316, 316 (N.Y. App. Div. 1978)).

district court's discretion. *Powell v. Symons*, 680 F.3d 301, 303 (3d Cir. 2012); *see A.P. ex rel. Phinisee v. United States*, 736 F. App'x 309, 312 (3d Cir. 2018) (per curiam). "When confronted with verifiable evidence from a mental health professional of an unrepresented litigant's incompetence, the district court has an obligation, pursuant to Rule 17, to inquire into the litigant's competency." *Powell*, 680 F.3d at 310.

While Rule 17(c) does not provide a standard for determining competency, Rule 17(b) provides that the capacity of a party to sue or be sued is determined by the law of the individual's domicile and that standard is also used for competency determinations under Rule 17(c). *See Richards*, 166 F. App'x at 598; *see also Powell*, 680 F.3d at 308 (stating that the law of the state of the individual's domicile applies); *Tejada v. DelBalso*, No. 3:18-cv-01096, 2018 WL 6047081, at *1 (M.D. Pa. Nov. 19, 2018) (following *Richards* and applying the law of the state of domicile to determine a litigant's competency). Therefore, whether Lopez is incompetent under Rule 17(c) is determined by applying the law of Lopez's domicile, which is New York. (ECF Nos. 122 at ¶4; 129 at ¶ 4)

### 2. Lopez's Refusal to Undergo an Independent Medical Examination

If a party refuses to submit to a mental examination ordered by the Court pursuant to Rule 17(c), the court may not dismiss the case with prejudice. *Krain v. Smallwood*, 880 F.2d 1119, 1121 (9th Cir. 1989); *see also Bodnar v. Bodnar*, 441 F.2d 1103, 1104 (5th Cir. 1971) (per curiam). Instead, the Court may dismiss the case without prejudice, appoint a lawyer to represent the individual, or proceed with a competency determination. *Krain v. Smallwood*, 880 F.2d 1119, 1121 (9th Cir. 1989); *see Krain v. Cnty. of Orange*, 897 F.2d 533 (9th Cir. 1990) (mem.); *Krain v. Brown*, 891 F.2d 295 (9th Cir. 1989) (mem.); *Long v. United States*, No. 1:13-CV-01228-JLT PC, 2014 WL 202713,

at *1 (E.D. Cal. Jan. 16, 2014). In determining the appropriate remedy, the Court is to ensure that the chosen remedy adequately protects the person's interests. *Smallwood*, 880 F.2d at 1121.

Here, dismissing the case without prejudice is not an appropriate remedy because the statute of limitations has run, so it would have the effect of a dismissal with prejudice. Appointing a lawyer to represent Lopez would also not be an appropriate remedy because, not only does Lopez's guardian ad litem already have a lawyer, the issue is Lopez's apparent desire to voluntarily dismiss the case with prejudice. Such a decision is the plaintiff's, not the lawyer's to make. Appointing a lawyer, then, is also not an appropriate remedy because it does not adequately protect Lopez's interests. Thus, the appropriate remedy was for the Court to proceed with a competency determination without the benefit of the independent medical examination.

### 3. Lopez Remains Incompetent Under New York Law

Because of the Court's obligations under Rule 17(c), the Court construes CSXT's motion seeking the removal of Lopez's guardian ad litem and return of control over the case to Lopez as a motion to reconsider the Court's previous ruling appointing Lopez's guardian ad litem. The Court finds that the appointment of a guardian ad litem for Lopez remains appropriate because Lopez is incompetent for purposes of this litigation.

### (a) New York Competency Standard

The parties disagree about what provision of New York law applies to the appointment of a guardian ad litem under Rule 17(c). CSXT argues that New York Mental Hygiene Law § 81 applies. (ECF Nos. 122 at ¶5; 123 at 3–4) Lopez's guardian ad litem contends that New York Civil Practice Law and Rules § 1201 applies. (ECF No. 129 at ¶¶ 5, 130 at 3–5)

The Court adopts the position advanced by Lopez's guardian ad litem and taken by the Eastern, Northern, and Southern Districts of New York that § 1201 is the appropriate standard for determining whether to appoint a guardian ad litem for an individual domiciled in New York under Rule 17(c).  *See Bowen*, 213 F. Supp. 2d at 223; *see also Duncan v. Sullivan Cnty.*, No. 18 CV 9269 (VB), 2020 WL 1033064, at *5 (S.D.N.Y. Mar. 2, 2020); *Francisque v. Clifford B. Finkle, Jr., Inc.*, No. 16 CV 3637 (RML), 2019 WL 2027434, at *1–2 (E.D.N.Y. May 8, 2019) (following *Bowen*); *Makas v. Holanchock*, No. 9:02-CV-00836-JKS, 2007 WL 1651830, at *4 (N.D.N.Y. June 7, 2007) (following *Bowen*).  Under § 1201, "[t]he party seeking appointment of a guardian ad litem must show by a preponderance of the evidence that the individual's 'condition impedes [his or] her ability to protect [his or] her rights.'"  *Francisque*, 2019 WL 2027434, at *1–2 (quoting *N.Y. Life Ins. Co. v. V.K.*, 711 N.Y.S.2d 90, 96 (N.Y. Civ. Ct. 1999)).  "[I]t is well settled that, under New York law, a guardian ad litem may be appointed by a court at any stage of an action in which an adult is incapable of adequately prosecuting or defending his rights, even where no formal adjudication of incompetence has been made."  *Bowen*, 213 F. Supp. 2d at 223 (citing *Ciena v. State (Matter of Lugo)*, 165 N.E.2d 581 (N.Y. 1960); *Tudorov v. Collazo*, 627 N.Y.S.2d 419 (N.Y. App. Div. 1995)).

Because no detailed definition of incapacity is set forth in § 1201, courts in New York have held that it is appropriate to use the definition of incapacity in the criminal rules.  *Makas*, 2007 WL 1651830, at *4 (citing *Matter of Vance A.*, 432 N.Y.S.2d 137, 146 (N.Y. Fam. Ct. 1980)).  In New York, "a defendant in a criminal case is incapacitated from standing trial if he 'lacks capacity to understand the proceedings against him or to assist in his own defense.'"  *Id.* (quoting N.Y. Crim. Proc. Law § 730.10).  This is also the federal standard.  *Godinez v. Moran*, 509 U.S. 389, 396 (1993).

### (b)  Lopez is Incompetent under the § 1201 Standard

Under the § 1201 standard, the Court continues to find that Lopez is not competent to conduct his case and that the appointment of a guardian ad litem remains warranted.  In making this conclusion, the Court relies on the evidence discussed above in Section II, including:  Lopez's social media posts, Lopez's filings with the Court and communications with counsel, the observations of Lopez's mother and cousin, and the reports and opinions of Dr. Green and Dr. Edwards.  The Court also relies on its own significant experience with Lopez, as well as the Court's observations and interactions with him.  *See Monroe v. Bryan*, 881 F. Supp. 2d 623, 628 (D. Del. 2012) (considering the court's own experience with the litigant in finding him competent).

Lopez is unable to communicate effectively with counsel or the Court.  *See Richards*, 166 F. App'x 595 (considering a litigant's pleadings and the litigant's ability to "communicate her ideas effectively" in finding the litigant competent); *Tejada*, 2018 WL 6047081, at *2 (considering the litigant's filings with the court, arguments, and ability to cite legal authority in finding that a litigant was competent).  Lopez's written filings and his oral communications are rambling, incoherent, and illogical.  *See Monroe*, 881 F. Supp. 2d at 628.  He is unable to communicate his ideas effectively.  *See Richards*, 166 F. App'x at 599.  Lopez does not have an adequate ability to "organize his points, make rational arguments [or] cite supporting legal authority." *Tejada*, 2018 WL 6047081, at *2 (quoting *Powell*, 680 F.3d at 309)  The Court accepts Dr. Green's assessment that, in both oral and written communications, Lopez's thinking is tangential, perseverative, and disorganized.  (ECF No. 129-2 at 6–7)  He routinely uses non-sensical words and uses language in illogical ways.  (ECF No. 129-2 at 6–7)  Further, because Lopez's communications are incoherent and contradictory, it is often difficult or impossible for the Court to determine what he actually intends.

The difficulties in trying to decipher Lopez's communications are further compounded by his fundamental misunderstanding about aspects of the litigation process and his frequent reversals of what he desires. For example, he believes that his case can be dismissed with prejudice but that, if it were dismissed, the case would continue without his further involvement. (ECF No. 129-3 at 2) He also believes that CSXT would agree to a settlement after he dismisses the case with prejudice. (ECF Nos. 112; 123-1 at 2; 114) Within a two-week period, Lopez requested to dismiss his case, then sought a settlement from CSXT in return for his dismissal, then agreed to the appointment of his guardian ad litem while simultaneously requesting a dismissal. (ECF Nos. 112; 123-1 at 2–3)

Lopez's oral communications to the Court during an in-person hearing contained many of the same conspiracy theories set forth in his social media posts: that his attorney and CSXT were conspiring together to kill him, that CSXT uses "numbers and articles" to place hits on people (including on himself), that CSXT is perpetrating "moronic pranks and tricks" against him and then claiming that it is all in his mind, and that November 3, 2019, being the end of daylight saving time, was part of a larger supernatural pattern around his case.

There is evidence before the Court from mental health professionals that Lopez is suffering from a mental illness and that he is incompetent. *See Tejada*, 2018 WL 6047081, at *2 (considering whether there has been a diagnosis or treatment of a mental illness of the type that would render the individual legally incompetent). Lopez has been diagnosed with a psychotic disorder due to head trauma, with delusions. (ECF No. 129-2 at 7) His condition constitutes a "major mental illness" and it is chronic. (*Id.* at 8) His delusional beliefs are "primarily focused on the various legal personnel and the transportation company involved" in this case. (ECF No.

129-2 at 7)  He does not have insight into the nature of his mental illness.  (*Id.* at 7)  Lopez has

incorporated the inquiry here regarding his competency into his delusional belief system.  (*Id.*)

While Dr. Green did not opine on his competency, Dr. Edwards concluded that Lopez was

incompetent because he could not consult with his lawyer with a reasonable degree of rational

understanding.  (ECF No. 85 at 65)

Especially important here is that Lopez's paranoid and delusional beliefs all center around

the litigation in this case.  As both Dr. Edwards and Dr. Green make clear—and as is clear from

the record—Lopez's paranoid delusions all revolve around his case against CSXT and his belief

that CSXT is engaged in a massive conspiracy regarding the litigation in this case.  Lopez believes

that CSXT is monitoring him, "kn[ows] his every move" (ECF No. 129-2 at 5), and that CSXT "has

lots of power, federal, personal favors that can be done."  (*Id.* at 6)  Lopez believes that CSXT

placed a hit on him in 2015.  He believes that his attorney was trying to kill him, was conspiring

with CSXT to lose his case, and conspiring with CSXT to put a hit out on him.  (*Id.*)  He believes

that he is facing criminal charges in New York to prevent him from appearing at a hearing in this

case.  (*Id.* at 5)  He believes that CSXT conspired to cause him to lose his job.  (*Id.* at 5)  On multiple

occasions, Lopez pointed a gun at his attorney and accused him of conspiring with CSXT to try

to kill him, put a hit out on him, and lose his case.  (ECF Nos. 85 at 32; 103 at 39–44, 55)  He believes

that CSXT and his attorney have been conspiring against him through song lyrics.  (ECF No. 85

at 61)  He believes that CSXT placed a hit out on him and is communicating with potential

assassins through "articles and numbers."  (ECF No. 103 at 53)  He believes that CSXT bribed a

television station to remove an article about him being hit by a train.  (ECF No. 85 at 59)  He

believes that police in Pennsylvania and New York are conspiring with CSXT to give him "car

tickets." (*Id.* at 55)  Further, he believes that the entire issue of his competency is a conspiracy by CSXT "to stop him from pursuing his case." (ECF No. 129-2 at 6)  He has also stated that the issue of his competency is part of a conspiracy by CSXT to murder him, and then use his finding of incompetency as evidence that he committed suicide rather than that he was murdered. (*Id.* at 5)  Given that all these delusional beliefs relate to this case, any decisions Lopez were to make with respect to this case would almost certainly be motivated by his delusional beliefs and not based in reality.

Lopez insists that he is competent.  Although such an instance should ordinarily be given weight by the Court, here it is not entitled to be given weight.  Lopez "lacks insight into the nature of his mental illness and, in fact, has incorporated evaluations of his mental state (i.e., by the police in 2015 and in 2019 as part of an evaluation of competency to proceed in his legal case) into his delusional belief system." (ECF No. 129-2 at 7)  Lopez's insistence that he is competent is premised on his delusional belief that CSXT, his attorney, the Court, and various law enforcement agencies are conspiring to have him declared incompetent in order to either ensure that he is loses his case against CSXT or to have him murdered, and then use the Court's incompetency finding to have his murder ruled a suicide.  Therefore, Lopez's instance that he is competent deserves no weight because his insistence on his competency is motivated by, and has been incorporated into, his delusional belief system.

Lopez's paranoid delusions also make him incapable of assisting in his case.  His paranoid delusions involve a grand conspiracy against him orchestrated by CSXT that includes both the Court and his attorney as co-conspirators.  Because Lopez believes that his attorney was conspiring with CSXT to lose his case and kill him, Lopez brandished a firearm at his attorney on

multiple occasions and threatened to kill him. Lopez's actions are motivated by his paranoid delusions and, not only is he unable to separate his delusions from reality, he does not recognize that his delusions are divorced from reality. He has incorporated the pendent litigation into his delusional beliefs. Under these circumstances, Lopez would be unable to proceed pro se and unable to provide any assistance to an attorney representing him.

Taken together, the Court's observations and the evidence it has received establish, by a preponderance of evidence, that Lopez's mental condition impedes his ability to protect his rights and that he "lacks capacity to understand the proceedings" and lacks the capacity to "assist in his own [case]." *Makas*, 2007 WL 1651830, at *4 (quoting N.Y. Crim. Proc. Law § 730.10).

CSXT objects to the Court considering Dr. Edwards's and Dr. Green's reports to find Lopez incompetent. CSXT argues that Dr. Green's report is insufficient because the purpose of the report was not to determine whether Lopez was competent but to determine his risk of committing violence. (ECF No. 133 at 5–5) The purpose of the evaluation, however, is irrelevant as it is the Court that is to determine whether Lopez is competent. Indeed, even if Dr. Green were conducting a competency evaluation of Lopez, the Court would not be bound by her determination. *See* Richards, 166 F. App'x at 598–99 (finding a litigant competent despite a psychiatrist concluding that the litigant was "incapable of distinguishing between reality and delusion (and is clearly unable) to prosecute" the case); *see also Matheney v. Anderson*, 377 F.3d 740, 748 (7th Cir. 2004). Thus, there no reason that Dr. Green's opinions should be given any less weight merely because the purpose of the evaluation was to evaluate Lopez's risk of committing violence.

CSXT also contends that Dr. Edwards only reviewed Lopez's social media posts, "did not render an opinion regarding Plaintiff's competency," and "concluded only that Plaintiff must be evaluated." (ECF No. 133 at 4–5)  In her report, Dr. Edwards acknowledged the limitations in conducting an evaluation based solely on social media posts without interviewing the individual. (ECF No. 85 at 65)  Despite these limitations, Dr. Edwards concluded that "it is the undersigned's opinion, held to a reasonable degree of psychological certainty, the Plaintiff does not sufficiently present the ability to consult with his lawyer with a reasonable degree of rational understanding."[11]  (*Id.*)  This opinion was based on "Lopez's chronic paranoia and perseveration of Counsel's conspiracy against him." (*Id.*)  CSXT's argument, then, is about the weight given to Dr. Edwards's opinion based on the limited evidence she reviewed.

The Court finds that Dr. Edward's opinion is entitled to significant weight for several reasons.  First, despite acknowledging the limitations of her review, Dr. Edwards still reached her conclusion "to a reasonable degree of psychological certainty." (*Id.* at 66)  Second, Dr. Edwards's evaluation and conclusions largely align with Dr. Green's evaluation.  Third, the information about Lopez's mental state in the record now before the Court, which Dr. Edwards did not have the opportunity to review, including the Court's own interactions and observations of Lopez, the observations of his mother and cousin, and the observations of Dr. Green from her three hour clinical interview of Lopez, are all consistent with the information on which Dr. Edwards's opinion is based.  In other words, the evidence is consistent with the evidence Dr. Edwards relied

---

[11]  The report also concluded:  "Following a review of aforementioned records, it is the undersigned's opinion, held to a reasonable degree of psychological certainty, Mr. Lopez is not competent to participate in his own legal proceedings.  At this time, he does not sufficiently present the ability to consult with his lawyer with a reasonable degree of rational understanding." (ECF No. 85 at 66)

on to determine that Lopez was not competent.  Finally, there is no evidence that Lopez's condition has improved since Dr. Edwards's report was issued on February 13, 2019, and one would not expect him to improve without treatment since his paranoid delusions have been largely the same since 2015 and Dr. Green considers Lopez's mental illness to be chronic. Therefore, the Court gives significant weight to Dr. Edwards's opinion that Lopez is not competent.

CSXT also contends that the fact that Lopez is facing criminal charges in New York and has not been found incompetent in those proceedings is evidence that he is competent.  (ECF No. 122 at 2)  This Court, however, it to make its own determination of Lopez's competency under Rule 17.  Although a determination of competency or incompetency in another Court is a relevant factor for this Court to consider, it is not dispositive.   Nor has the Court been presented with any evidence that Lopez has or has not been found competent in his New York case, CSXT merely asserts as much.  The Court will not infer that because no determination has been made in that case, he must be competent.  Further, even if Lopez were competent with respect to other aspects of his life, that does not mean that he is also competent with regard to this litigation because his paranoid delusions center on this litigation and Lopez's actions with regard to this litigation are motivated by the paranoid delusions.

### (c)  Lopez is also Incompetent Under the Article 81 Standard

Assuming that CSXT is correct in arguing that the Article 81 standard applies, Lopez is incompetent under that standard as well.  Article 81 is New York's general guardianship provision.  N.Y. Mental Hyg. Law § 81.01 (stating that the purpose of Article 81 is to "promote the public welfare by establishing a guardianship system which is appropriate to satisfy either

personal or property management needs of an incapacitated person in a manner tailored to the

individual needs of that person").   A general guardian may be appointed for an individual if the

court determines:  (1) "that the appointment is necessary to provide for the personal needs of

that person, including food, clothing, shelter, health care, or safety and/or to manage the

property and financial affairs of that person"; and (2) "the person agrees to the appointment or

the person is incapacitated."  N.Y. Mental Hyg. Law § 81.02.  The statute provides:

> (b) The determination of incapacity shall be based on clear and convincing evidence and shall consist of a determination that a person is likely to suffer harm because:
> > 1. the person is unable to provide for personal needs and/or property management; and
> > 2. the person cannot adequately understand and appreciate the nature and consequences of such inability.

*Id.*  The statute also provides the considerations that a court is to take into account when

determining whether someone is incapacitated:

> (c) In reaching its determination, the court shall give primary consideration to the functional level and functional limitations of the person. Such consideration shall include an assessment of that person's:
> > 1. management of the activities of daily living, as defined in subdivision (h) of section 81.03 of this article;
> > 2. understanding and appreciation of the nature and consequences of any inability to manage the activities of daily living;
> > 3. preferences, wishes, and values with regard to managing the activities of daily living; and
> > 4. the nature and extent of the person's property and financial affairs and his or her ability to manage them.
>
> It shall also include an assessment of (i) the extent of the demands placed on the person by that person's personal needs and by the nature and extent of that person's property and financial affairs; (ii) any physical illness and the prognosis of such illness; (iii) any mental disability, as that term is defined in section 1.03 of this chapter, alcoholism or substance dependence as those terms are defined in section 19.03 of this chapter, and the prognosis of such disability, alcoholism or substance dependence; and (iv) any medications with which the

person is being treated and their effect on the person's behavior, cognition and
judgment.
      (d) In addition, the court shall consider all other relevant facts and
circumstances regarding the person's:
            1. functional level; and
            2. understanding and appreciation of the nature and consequences
of his or her functional limitations.

*Id.* A guardian appointed under Article 81 is to be "granted only those powers which are

necessary to provide for the personal needs and/or property management of the incapacitated

person in such a manner as appropriate to the individual and which shall constitute the least

restrictive form of intervention . . . ." *Id.*

      The Court finds that "the appointment [of a guardian ad litem for this case] is necessary

for the personal needs of [Lopez] . . . to manage [his] property and financial affairs" and that

Lopez is "incapacitated." *Id.* Lopez is incapacitated under Article 81 because the Court finds,

by clear and convincing evidence, that Lopez is "likely to suffer harm because" he is "unable to

provide for his property management" and financial affairs and "cannot understand and

appreciate the nature and consequences of such inability." *Id.*

      Here, given the limited nature of the guardianship at issue, especially when compared to

the broad powers and authorities of a general guardian, many of the factors in § 81.02 are not

applicable. Therefore, although the Court considers all the factors, the Court only specifically

addresses those factors relevant for the appointment of a guardian ad litem under the

circumstances of this case. First, Lopez is unable to understand and appreciate the nature and

consequences of his inability to manage the activities of this case. Lopez believes there is a

massive conspiracy against him—in which CSXT has co-opted his attorney, law enforcement,

and the Court—and that CSXT will stop at nothing, including murder, to force him to drop the

case or ensure that he loses the case.  Second, Lopez's preferences, wishes, and values regarding the management of this case are inconsistent, conflicting, and are motivated by his delusional beliefs.  Third, Lopez is unable to manage the litigation of this case.  He does not understand the process and the import of dismissing the case with prejudice and his decisions about the case are motivated by his paranoid delusions.  Fourth, Lopez has been diagnosed with Psychotic Disorder due to head trauma, with delusions which the psychologist who evaluated him determined was chronic and was a "major mental illness."  (ECF No. 129-2 at 7)  Fifth, multiple mental health experts have recommended treatment, but Lopez does not appear to have received any treatment for his mental illness.  Finally, Lopez does not understand or appreciate the nature and consequences of his functional limitations.  "He lacks insight into the nature of his mental illness" and "has incorporated . . . "[this Court's] evaluation of his competency . . . into his delusional belief system."  (ECF No. 129-2 at 7)

A guardian appointed under Article 81 is to be "granted only those powers which are necessary to provide for the personal needs and/or property management of the incapacitated person in such a manner as appropriate to the individual and which shall constitute the least restrictive form of intervention . . . ."  N.Y. Mental Hyg. Law § 81.02.  Here, the powers of a guardian ad litem are extremely limited in comparison to a general guardian because the guardian ad litem has only been appointed for this case.  Thus, under the Article 81 clear and convincing evidence standard, the Court finds that Lopez is incapacitated and the appointment of a guardian ad litem remains necessary.

III.    Conclusion

For the foregoing reasons, the Court denies CSXT's Motion to Remove Plaintiff's Guardian ad Litem.  The appointment of Lopez's guardian ad litem under Federal Rule of Civil Procedure 17(c) was, and remains, appropriate to protect Lopez because Lopez is incompetent.[12]

An appropriate order follows.

---

[12] CSXT contends that the authority of a § 1201 guardian ad litem is limited and that the guardian ad litem lacks the authority to override the desires of the individual.  (ECF No. 133 at 5–8)  Because Lopez is incompetent under both the § 1201 and the Article 81 standards, the Court need not consider this argument. The Court also does not address Lopez's guardian ad litem's argument that the Pennsylvania Department of Human Services has an interest in this litigation.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JONATHAN LOPEZ, | ) | |
| | ) | Case No. 3:14-257 |
| Plaintiff, | ) | |
| | ) | JUDGE KIM R. GIBSON |
| v. | ) | |
| | ) | |
| CSX TRANSPORTATION, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER**

**AND NOW**, this 20th day of October 2020, upon consideration of Defendant CSX Transportation's "Motion to Remove Plaintiff's *Guardian Ad Litem*." (ECF No. 122), and for the reasons set forth in the accompanying Memorandum Opinion, **IT IS HEREBY ORDERED** that Defendant's motion is **DENIED**. Ramona Ilarrava remains Jonathan Lopez's guardian ad litem for purposes of this action.

BY THE COURT:

_____

**KIM R. GIBSON**
**UNITED STATES DISTRICT JUDGE**